COMMONWEALTH *vs.* CORNELIUS A. SHEA & another.

Worcester. September 27, 1948. — November 12, 1948.

Present: QUA, C.J., LUMMUS, DOLAN, RONAN, & SPALDING, JJ.

*Conspiracy. Evidence*, Admissions and confessions, Cumulative evidence. *Error*, Whether error harmful. *Practice, Criminal*, Exceptions: whether error harmful, general exception; Discretionary control of evidence. *Witness*, Credibility, Cross-examination, Contradiction.

Acquittal of defendants, upon an indictment for breaking and entering a railroad car with intent to steal and for larceny of property therein, did not as a matter of law preclude a conviction upon an indictment against them for conspiring to steal the same property, tried at the same time and upon the same evidence.

Proof of an averment, in an indictment for conspiracy to steal, of the identity of the owner of the property sought to be stolen, while not essential to conviction, was important evidence in support of the charge of conspiracy.

A conviction of two defendants under an indictment charging a conspiracy to steal certain property was warranted by evidence of intimate relations between them preceding a theft of the property, of their presence in the immediate vicinity of the theft when it occurred, of their possession of the property immediately subsequent thereto, and of admissions by them by conduct and statements.

No reversible error was shown in the admission in evidence, at the trial of an indictment charging two defendants with conspiracy to steal, of a written statement by one of them implicating his alleged confederate, although the conspiracy had come to an end before the statement was made, where it appeared that the statement added nothing to testimony, already in evidence, by the defendant making the statement.

No valid exception was saved by counsel for a defendant at the trial of an indictment where he merely excepted to so much of the judge's charge as was inconsistent with the defendant's requests for rulings and failed to respond to a request by the judge to point out particular portions of the charge to which he objected.

A judge presiding at the trial of an indictment, having properly charged the jury that they should consider bias and prejudice of witnesses, was not required to comply with a request by the defendant to instruct the jury that they could disregard entirely the testimony of a witness found to be biased and hostile to the defendant.

No error appeared in a refusal by a judge presiding at the trial of an indictment to permit counsel for the defendant to read, in cross-examination of a witness for the Commonwealth and purportedly for the purpose of contradicting him, questions put to and answers already given by him in direct examination.

In cross-examination of a witness for the Commonwealth at the trial of an indictment, no error appeared in the exclusion of questions designed to show hostility of the witness toward the defendant where that fact was well established by the previous evidence and was not denied by the Commonwealth.

A police officer, witness for the Commonwealth at the trial of an indictment, whose apparent dereliction of duty in failing to arrest the defendant, another officer, and to report to his superior, had been shown in his cross-examination to discredit him, properly was allowed to explain such failure.

INDICTMENT, found and returned on October 21, 1947, charging that the defendants Cornelius A. Shea and Bernard W. Chesties on June 16, 1947, did conspire together to steal meat, the property of Chicago Dressed Beef Co., Inc.

The indictment was tried before *Beaudreau,* J., with an indictment, found and returned on August 19, 1947, charging that the same defendants on June 18, 1947, did "break and enter in the nighttime" a railroad car "with intent therein to commit larceny" and "did steal" "meat . . . the property of Chicago Dressed Beef Co., Inc." The defendants were found not guilty on the indictment for breaking and entering and larceny, and guilty on the indictment for conspiracy to steal; and alleged exceptions.

*Nunziato Fusaro,* for the defendant Shea.

*J. S. Derham,* for the defendant Chesties.

*A. B. Cenedella,* District Attorney, (*J. F. Baxter,* Assistant District Attorney, with him,) for the Commonwealth.

RONAN, J.   Shea, a police officer, and Chesties, a wholesale and retail meat dealer, were indicted and tried upon an

indictment charging them with breaking and entering a railroad car with intent to steal and the larceny of meat therefrom, the property of the Chicago Dressed Beef Co., Inc., and upon a second indictment accusing them of conspiracy to steal the property of the said company. They were acquitted upon the first indictment and convicted upon the second. The defendants excepted to the denial of motions for directed verdicts of not guilty, to rulings on evidence, to the instructions to the jury, and to the manner in which the judge dealt with their requests for instructions.

We first consider the rulings denying the motions for directed verdicts. The correctness of these rulings is to be determined by the facts which the jury might find to have been established by the evidence. Chesties had called upon Shea as many as twenty-five times in the evening at the police station which Shea and other patrolmen used as headquarters in performing their duties in the district in which the station was located. The defendants exchanged money and different papers at this station on a dozen occasions. At times, they met at night at a restaurant near the station. Chesties would sometimes call at the station after midnight, and would leave with Shea and sit and talk in Shea's automobile which was parked near the station.

Two police officers saw the defendants riding in Shea's automobile at 2:40 A.M. on June 16, 1947, proceeding toward the garage occupied by Chesties. This garage, which was hired by Chesties, had four stalls, one of which he used for a meat freeze unit and one for his truck, and the remaining two were vacant. At the time just mentioned, Shea drove his automobile into the garage where both defendants remained for ten to fifteen minutes. The doors of the garage were then opened, and Shea's automobile was driven out on the driveway and Chesties got out. Chesties drove his truck into the garage and then got in Shea's automobile which left in the direction of the police station. Shea was wearing a civilian's coat and hat, although at that time he was supposed to be wearing his police uniform and patrolling his regular route which did not include the location of the garage.

Shea shortly before midnight on June 17, 1947, was placed in charge of the station for the shift which commenced at 11:50 P.M. and ended at 7:45 A.M. on June 18, 1947. Shea assigned Officer Cerrone to patrol route 1 which was Shea's regular route. On this route were located the premises of the Worcester Cold Storage and Warehouse Company. A portion of the street floor of these premises was occupied by the Land O'Lakes Creameries Inc., hereinafter called the creamery company, and an adjoining portion by the Chicago Dressed Beef Co., Inc., hereinafter called the beef company. Both defendants were familiar with the premises as Chesties had been employed by the beef company for seven years and also by the firm which had previously occupied the premises now occupied by the creamery company, and Shea had also worked for the beef company. Shea had for a number of years observed the premises in the performance of his duties as a police officer. Entrance from the street to the creamery company could be had by going through a door which was the overhead type garage door. He had a key to this door which he returned in May, 1947.

Before Officer Cerrone left the station shortly before 11:50 P.M. on June 17, 1947, he was instructed by Shea to come back to the station at 1:10 A.M. as Shea said he would then need to go out to get some food. Cerrone returned to the station at 1:45 A.M. Shea left in one half an hour thereafter. Cerrone remained at the station until Shea returned at 3:30 A.M. During this time the premises of the beef company were left unprotected by any patrolman covering his route on foot.

There were four freight cars on the siding of the beef company shortly after midnight on the morning of June 18, 1947. Upon inspection by police officers three were found to be empty and the seal on the door of one referred to as the second car was found to be intact. This seal was the flat band type which could have been found to have been placed on the car when it began its journey to Worcester. Shea left the station at 2:15 A.M. At about 2:30 A.M. two police officers hidden under one of the cars saw two men

make four or five trips from this second freight car, carrying bundles to the rear door of the creamery company. They were unable to identify them because of the darkness and they were no more distinct than two shadows. Shea was seen to get out of his automobile on Franklin Street in front of the creamery company at about 2:30 A.M. and to walk to the overhead door of the creamery company. There was another person then in his automobile. A citizen who knew Shea stopped to talk with him. A few minutes later Shea's automobile was seen backing out of the entrance to the creamery company where the overhead type of door was. Chesties got into the automobile which was then driven to Chesties' garage. Three police officers soon entered the garage as the defendants were unloading meat from the back of Shea's automobile into the freezing unit. Shea had a box of pork loins marked "Morrell" in his hands. The rear seat of his automobile had been removed and there was a side of beef covered by a canvas in the back of the automobile. In reply to a question from one of the officers as to what he was doing with the meat, Shea said it was none of his business. Another officer then accused Shea of doing this sort of thing right along. Shea said that this was the first time, and when the officer told him that he had seen him driving into the garage two nights previously Shea then said it was his second time. Another officer asked, "Are you trying to kid? You have been doing this right along." Shea said, "This is only the third time." Another officer called Shea a vile name, threatened to assault him, and was proceeding to arrest him when another officer intervened upon Shea's begging not to be arrested and said he would give Shea "a break if he would stop this kind of stuff." Shea "offered to split the loot with them" but the officers said they wanted no part of it.

The officers returned to the freight car, found the seal had been broken, saw six or seven boxes of pork loins marked "Morrell" on the floor which were the same type of boxes and pork loins as they had seen at Chesties' garage, and noticed that three or four hooks were empty where hinds of beef had been hanging. Lamb, veal and hams were

strewn on the floor. They closed the door of the car and left it.

Before Cerrone left the station at 3:30 A.M. to resume patrolling his route, Shea told him that he had gone "down in back of Chicago Dressed Beef to pick up some meat that was left for me, and as I went up to the garage where Chesties keeps his truck, Frank, Cliff, and Louie [three police officers] accused me of breaking into a car, and called me a thief. Officer Annunziata was going to knock my block off, and I tried to tell them where the meat came from, but they did not believe it. . . . What could I do, they caught me red-handed with the meat in Chesties' garage. . . . I'm telling you the truth, Charlie, I didn't break into no car, I am no thief."

Shea drove Cerrone to the freight car a little after six o'clock on the morning of June 18, 1947, and showed him the seal on a freight car on the siding. It was a ball type of seal and looked all right. Shea told Cerrone that he wanted Cerrone to see that the seal was intact as the other police officers would probably cause him trouble. Shea testified that he was familiar with the sealing and unsealing of freight cars. There was evidence that, if a car is partially unloaded by the beef company when its employees quit for the day or if the seal is broken to get something from a car for a customer, seals supplied by one Kennedy, the freight agent of the Boston & Albany Railroad Company, are used to protect the contents of the car. These seals were different from the flat type of seal.

The acquittal of the defendants on the breaking and entering and larceny indictment did not affect the prosecution for a conspiracy to steal. The offences were distinct from and independent of each other. A conviction on either indictment would not bar a conviction on the other, and this would be true even if one indictment had charged the defendants with committing a crime and the second had charged them with a conspiracy to commit the same offence. *Commonwealth* v. *Walker*, 108 Mass. 309. *Commonwealth* v. *Bloomberg*, 302 Mass. 349. *Commonwealth* v. *Fine*, 321 Mass. 299, 305. It is apparent that the jury were not

satisfied that the defendants actually broke into the freight car, or committed larceny therein, as the testimony showed that the officers were unable to identify the thieves because of the darkness. The defendants were charged with being principals in the commission of a felony, and the jury had the right to refuse to find that they were present aiding and abetting those who removed the goods from the car. They could believe Shea's statement that the meat was left for him in back of the beef company so, as they could find, that the defendants might steal it. *Commonwealth* v. *Merrick*, 255 Mass. 510, 513. *Commonwealth* v. *DiStasio*, 297 Mass. 347, 356, 357.

The defendants, having been accused of conspiring to steal the meat of the beef company, contend that there was no evidence that meat in their possession at the garage was the property of the company. The jury were instructed that the Commonwealth must prove that this meat was the property of the beef company. This instruction was too favorable to the defendants. The gist of the offence with which the defendants were charged was the combination or confederacy to steal the meat of the beef company. This indictment for conspiracy did not accuse them of stealing the meat, and consequently the Commonwealth in order to secure a conviction was not required to prove that they stole the meat or that it was in the possession of or owned by the beef company. The theft of the meat was alleged to be merely the object of the conspiracy and was a part of the description of the conspiracy alleged in the indictment. It was the obligation of the Commonwealth to prove that the defendants had entered into a combination to steal the meat. *Commonwealth* v. *Harley*, 7 Met. 506. *Commonwealth* v. *Kellogg*, 7 Cush. 473. *Commonwealth* v. *Lopes*, 318 Mass. 453. This is also the real point decided in *Commonwealth* v. *Manley*, 12 Pick. 173, although as correctly observed in Wharton, Criminal Law (12th ed.) 1885, "the point ruled; though the case has been cited for other purposes, was simply that, in such case, the property of the note being in the husband, the fraud should have been laid as directed against him." The offence was completed upon the formation of the

confederacy to steal, and the theft of the meat was an aggravation of the offence charged and was also cogent evidence of the confederacy of the defendants. *Commonwealth* v. *Judd,* 2 Mass. 329. *Commonwealth* v. *Tibbetts,* 2 Mass. 536. *Commonwealth* v. *Warren,* 6 Mass. 74. *Commonwealth* v. *Fuller,* 132 Mass. 563. *Commonwealth* v. *Harris,* 232 Mass. 588. *Commonwealth* v. *Dyer,* 243 Mass. 472, 484. *Commonwealth* v. *Saul,* 260 Mass. 97.

Evidence that the meat found in the possession of the defendants was the property of the beef company was important evidence in support of the charge that they had entered into a conspiracy to steal it and in determining whether their motions for directed verdicts should have been granted.

There was a conflict in the evidence as to the car number of the only unopened freight car that stood on the siding on the early morning of June 18 and whether the contents of that car were beef, pork and a variety of different kinds of meat or beef alone, and whether the seals upon the doors of that car had been broken and any goods removed therefrom up to the time it was unloaded by the employees of the beef company. According to testimony of witnesses from the beef company, they had two cars of meat on the siding on June 17, 1948, and the car containing only beef was unloaded on that date. The documentary evidence indicated that one car contained a cargo of beef and the other various kinds of meat. It is sufficient for present purposes to point out that the jury could accept the testimony of the police officers that the only unloaded car on the siding had been broken into and that the goods removed therefrom were the goods which were shortly thereafter found in the possession of the defendants at Chesties's garage. They could also find that the shipment of these goods was made by the packer under a uniform order bill of lading consigned to the shipper with directions to notify the beef company; that the bill of lading was indorsed to the beef company by the shipper and sent with a sight draft to a bank in Worcester; that the beef company paid the draft and obtained possession of the bill of lading which it surrendered to

the railroad company on June 17; that the car had been delivered to the beef company; and that not only the possession of but also the title to the goods had been acquired by the beef company prior to the time the car was broken into. *Libby* v. *Ingalls*, 124 Mass. 503, 505. *Ryder & Brown Co.* v. *E. Lissberger Co.* 300 Mass. 438, 443. *Rice & Lockwood Lumber Co.* v. *Boston & Maine Railroad*, 308 Mass. 101. *Dows* v. *National Exchange Bank*, 91 U. S. 618, 631. *Bowles* v. *Beucher*, 53 Fed. Sup. 984. Benjamin, Sales (6th ed.) 351. Williston, Sales (Rev. ed.) § 287. 60 A. L. R. 677.

The jury could find that the original seal had been broken and a new and different type of seal had been substituted, and that Shea in showing this seal to Cerrone was attempting to conceal the fact that the car had been entered a few hours previously. The evidence could properly be considered as an admission by Shea. *Commonwealth* v. *Hall*, 4 Allen, 305. *Commonwealth* v. *Daily*, 133 Mass. 577. *Commonwealth* v. *Sullivan*, 156 Mass. 487. *Commonwealth* v. *Albert*, 222 Mass. 196.

None of the various contentions which have been mentioned, all of which were addressed to the denial of the motions for directed verdicts, is tenable. There was no error in refusing to grant the motions.

The judge admitted a signed statement of Chesties under date of July 1, 1947, against Shea, and a written statement of the latter under the same date against Chesties, over the exception of the defendant who had not signed the particular statement. The rule is well established that, when sufficient evidence has been introduced at a trial of an indictment for conspiracy to support a fair inference of the existence of a conspiracy, the acts and declarations of a defendant, which previously had been admitted only against him, become competent against all the defendants, if such acts and declarations are shown to have occurred during the pendency of the conspiracy and in furtherance of its object; but that if such acts or declarations are shown to have taken place after the conspiracy came to an end, then they are not admissible against the other defendants. *Commonwealth* v. *McDermott*, 255 Mass. 575, 581–582.

*Commonwealth* v. *Benesch,* 290 Mass. 125, 132, 133. *Commonwealth* v. *Mannos,*[1] 311 Mass. 94, 106. We are unable to find any evidence that the conspiracy was pending as late as July 1, 1947, and the judge was in error in telling the jury that there was.

A comparison of the testimony of each defendant with his written statement shows that little, if anything, of any materiality was added to his testimony by his statement. Whatever discrepancies there were between the contents of the statement and the testimony of the defendant who signed the statement were too minor and trivial to affect adversely the defendant other than the signer. The entire testimony of each was without objection left to be considered by the jury without any limitations against the other. Even if there was technical error in admitting the statement of one against the other, it is plain that it did not affect the substantive rights of either defendant. The exceptions to the admission of the statement of each of the defendants against the other are overruled. *Commonwealth* v. *McDermott,* 255 Mass. 575, 582. *Bendett* v. *Bendett,* 315 Mass. 59, 65–66.

The first four requests for rulings set forth in much detail the nature of and effect to be given to circumstantial evidence and the remaining five requests dealt with reasonable doubt. The judge stated the nature of circumstantial evidence and gave examples of its use and effect. He then frequently referred to the obligation of the Commonwealth to prove beyond a reasonable doubt each and every material element of the offence charged. The various acts and declarations of these defendants as disclosed by direct evidence, if believed, left little need for circumstantial evidence. The charge sufficiently covered the subject, and the jury could not have possibly convicted the defendants unless and until the Commonwealth had established its case by the required standard of proof. That the defendants were entitled to no more is settled by *Commonwealth* v. *Goodwin,* 14 Gray, 55, 56. See also *Commonwealth* v. *Mannos,* 311 Mass. 94, 113; *United States* v. *Becker,* 62 Fed. (2d) 1007; *Lambert* v. *State,* 234 Ala. 155.

At the conclusion of the charge the defendants stated that they excepted to so much of the charge as was inconsistent with their requests for rulings. The judge properly characterized such an exception as a "shot-gun exception" and was within his rights in requesting the defendants to point out the particular portions of the charge that they claimed to be erroneous. Having failed to do so, they did not save any valid exception. *Fairman* v. *Boston & Albany Railroad,* 169 Mass. 170, 174. *Boylan* v. *Everett,* 172 Mass. 453, 458. *Leonard* v. *Doherty,* 174 Mass. 565, 572. *Matter of Loeb,* 315 Mass. 191, 195. *Hathaway* v. *Checker Taxi Co.* 321 Mass. 406, 409. We do not intimate, if the point were open, that any error as alleged appears in the charge when considered, as it must be, in its entirety. *Nelson* v. *Economy Grocery Stores Corp.* 305 Mass. 383, 386. *Perella* v. *Boston Elevated Railway,* 306 Mass. 547, 549. *Goltz* v. *Besarick,* 313 Mass. 14, 17.

The defendants took exceptions to particular portions of the charge. There was nothing wrong in what the judge said as to the evidence of the ownership of the meat by the beef company. He did no more than to direct the jury's attention to certain evidence on this aspect of the case. He properly charged the jury that they should consider the bias and prejudice of the witnesses. He was not required, as the defendants contend, to tell the jury that they could disregard entirely the testimony of a witness found to be biased and hostile to the defendants. *Commonwealth* v. *Putnam,* 2 Allen, 301. *Commonwealth* v. *Downing,* 4 Gray, 29. *Commonwealth* v. *Wood,* 11 Gray, 85. *Commonwealth* v. *Galligan,* 113 Mass. 202. *Rumrill* v. *Ash,* 169 Mass. 341, 346. *Ott* v. *Board of Registration in Medicine,* 276 Mass. 566, 575.

The definition of conspiracy as finally given to the jury was full, complete and adequate, and no exception was taken to it. *Commonwealth* v. *Hunt,* 4 Met. 111. *Commonwealth* v. *Dyer,* 243 Mass. 472, 484, 485.

The judge refused to allow counsel for Chesties to read, from a transcript of the evidence, previous testimony of a witness called by the Commonwealth for the purpose of

contradicting him.   The judge in excluding the questions stated that he was sure that the jury would remember the previous testimony of the witness and that his real objection was the repetition of the same questions.   If we assume that the testimony given in cross-examination was inconsistent with his testimony given in direct examination, it is to be observed that the testimony which counsel intended to read was already in the case and that the right of the defendant to use it for the purpose of contradicting the witness was in no way impaired by excluding its repetition.   *Demerritt* v. *Randall,* 116 Mass. 331.   *Jennings* v. *Rooney,* 183 Mass. 577, 579.   *Smith* v. *Boston Elevated Railway,* 208 Mass. 186, 187.   *Commonwealth* v. *Russ,* 232 Mass. 58, 78, 79.   *Commonwealth* v. *Chin Kee,* 283 Mass. 248, 259.   The case differs from one where a party is denied the right to introduce new evidence to contradict a witness upon a material matter. *Day* v. *Stickney,* 14 Allen, 255.   *Commonwealth* v. *Marcellino,* 271 Mass. 325.   *Commonwealth* v. *West,* 312 Mass. 438.

Counsel for the defendant Shea excepted to the refusal of the judge to permit him to inquire of the witness Annunziata if he had asked Shea for a loan of $1,000 in April, 1947.   Annunziata had already testified that he had borrowed $30 from Shea in February, 1947.   The purpose of asking the question about the $1,000 was to show bias and prejudice on the part of Annunziata.   The evidence already recited, as well as much more which need not be stated, was so full and complete to show ill feeling between the witness and Shea that the fact could hardly be disbelieved.   The Commonwealth did not deny it and Shea insisted upon recognition of its existence.   Another incident that might have increased it was hardly more than cumulative evidence. It only added more fuel to the fire.   The short answer, however, is that it is settled that how far the cross-examination of a witness may be considered helpful and relevant to the issues on trial, as well as the extent that the accuracy, veracity and credibility of a witness may be tested, rests largely in the sound discretion of the trial judge, and his action, where as here no abuse of discretion is shown, is final.   *Com-*

*monwealth* v. *Phelps,* 210 Mass. 109, 114. *Commonwealth* v. *Patalano,* 254 Mass. 69, 72. *Gerber* v. *New York Central Railroad,* 288 Mass. 318, 321. *Baxter* v. *Bourget,* 311 Mass. 490, 492. *Commonwealth* v. *Beal,* 314 Mass. 210, 229. Annunziata was permitted over an exception to testify as to his reason for not arresting Shea on the morning of June 18 and for not reporting to his superior what he had seen that morning. His failure to arrest and report was gone into in the cross-examination of the witness evidently in an attempt to discredit him, and he was properly allowed to explain his neglect to arrest and his delay in making out his report. *Commonwealth* v. *Armstrong,* 158 Mass. 78. *Rumrill* v. *Ash,* 169 Mass. 341, 347. *Commonwealth* v. *Richmond,* 207 Mass. 240, 246. *Foley* v. *Lord,* 232 Mass. 368, 370, 371. *Mitchell* v. *Walton Lunch Co.* 305 Mass. 76, 79.

*Exceptions overruled.*