COMMONWEALTH *vs.* BRADFORD BOYD.

Norfolk.   October 7, 1974. — March 25, 1975.

Present: TAURO, C.J., REARDON, QUIRICO, HENNESSEY, & KAPLAN, JJ.

*Homicide. Insanity. Practice, Criminal,* Disclosure of evidence
before grand jury, Double jeopardy, Speedy trial, Charge to jury.
*Evidence,* Of another crime, Opinion: expert, Preliminary
question, Of insanity, On cross-examination, Presumptions and
burden of proof. *Constitutional Law,* Double jeopardy, Speedy
trial. *Penal Institution.*

There was no error in the denial of a motion to inspect the minutes
of the grand jury by an inmate of a prison tried in 1973 for
murder of another inmate and confined in a segregation unit
immediately after the killing and until trial, prior to which he was
provided with broad discovery, in the absence of a showing of a
"particularized need" to inspect or of prejudice in the denial of
the motion.   [172-174]
A motion of a defendant indicted for murder that the Commonwealth
be prohibited from employing, under G. L. c. 233, § 21, his
prior conviction of rape to impeach his credibility, were he to
testify, was properly denied.   [174]
A conclusion that confinement of a black Muslim inmate of a prison
in a segregated, but not punishment, unit there immediately after
he killed a black non-Muslim inmate, and for almost fifteen
months thereafter, was not administrative punishment but was
necessary protective custody was warranted by evidence that
turmoil existing in the prison when the killing occurred neces-
sitated segregation of Muslims, and that thereafter the killer's life
would not have been safe in the general population of the prison,
in which there were serious disturbances; there was no merit in
a contention that the killer's trial for murder placed him in double
jeopardy.   [175-176]
In the circumstances, G. L. c. 277, § 72A, as appearing in St. 1965,
c. 343, did not require dismissal of an indictment for murder tried
almost fourteen months after its return, although the defendant

filed a motion for a speedy trial just over a month later, where it appeared that the defense was insanity and that the period of delay encompassed successive hearings on motions and the psychiatric examination of the defendant requested by his counsel and additional time required by the Commonwealth to undertake its responsive psychiatric examination [177-180]; there was no violation of the defendant's constitutional right to a speedy trial, since the defendant was responsible for much of the delay, in which his counsel acquiesced, and the only possible prejudice to the defendant was his confinement in a segregation unit of a prison for his protection until trial, and the death of one of his psychiatrists, two of whom testified in his behalf [180-181].

At a trial for murder in which insanity was a defense there was no merit in the objections to the opinion of a doctor who testified for the Commonwealth that the defendant was criminally responsible in that the doctor was not asked whether his opinion was based on reasonable medical certainty, where it appeared that he had examined the defendant and stated his opinion in unequivocal terms [181]; in that the doctor was not a specialist in psychiatry, since he had been principal psychiatrist and assistant medical director at a State hospital [181-183]; or in that the judge failed to make a preliminary finding that the doctor was qualified as an expert, since the judge so believed and so indicated to counsel and permitted the opinion testimony only after finding the doctor qualified [183].

At the trial of an indictment for murder in the first degree against a defendant who relied on insanity as a defense, a finding that he was criminally responsible beyond a reasonable doubt was warranted by the opinion of a doctor testifying for the Commonwealth, although defendant's psychiatrists testified contrawise, by evidence that the defendant was of average or above average intelligence and had no prior history of mental disease, and by a description of his behavior on the day of the murder; the malice required for conviction was manifested by the defendant's twice stabbing the victim with a sharpened kitchen knife. [183-184].

At the trial before an all white jury of a black Muslim for the murder of a black non-Muslim, where the defense was insanity and a psychiatrist testified to the defendant's religious zeal, which included a belief that the victim had to be removed in order to protect the Muslim movement, and based his opinion that the defendant was not criminally responsible largely upon a characterization of the defendant as a religious zealot, there was no error in allowing

the prosecutor, in cross-examination of the psychiatrist, to ask a question in reference to the Muslim religion designed to challenge the genuineness of the defendant's religious fervor. [184-185]

At a trial in which the fact that the defendant had committed murder was established by uncontroverted evidence and he relied entirely on the defense of insanity, there was no prejudice in two statements in the judge's charge, while speaking about the insanity defense, that the defendant had killed the deceased. [185-187]

At a trial for murder, there was no error in the judge's implying during a general discussion of the credibility of witnesses that in telling about the incident the defendant, and the witnesses for the Commonwealth, may have put on "rose-colored glasses" [187]; nor was there error in the judge's alluding to the prosecution's attack on the credibility of a psychiatrist who had examined the defendant during the trial [187].

There was no merit in a contention, by a defendant convicted of a crime, of error in the trial judge's instructions as to the presumption of innocence, which included statements that the presumption was not evidence, in that the judge should have stated that the presumption stayed with the defendant until the jury were convinced of his guilt beyond a reasonable doubt. [187-189]

At the trial of an indictment for murder in which insanity was a defense, there was no merit in a contention that the judge's charge on manslaughter, which included references to passion and provocation as possible causes of the killing, blurred the distinction between voluntary manslaughter and not guilty of murder by reason of insanity. [189-190]

At a murder trial in which a verdict of guilty of voluntary manslaughter might have been returned, there was no error in the judge's warranted statement to the jury that the victim represented no current threat to the defendant at the time of the killing. [191]

INDICTMENT found and returned in the Superior Court on January 7, 1972.

A motion to inspect grand jury minutes was heard by *Spring, J.*, and the case was tried before *Good, J.*

*P. J. Piscitelli* for the defendant.

*John P. Connor, Jr.*, Assistant District Attorney, for the Commonwealth.

REARDON, J. The defendant was convicted in the Superior Court of first degree murder in a case taken under G. L. c. 278, §§ 33A-33G. The case is here on assignments of error.

The facts are not in dispute.  At approximately 7:30 A.M. on December 19, 1971, the defendant, incarcerated at the Massachusetts Correctional Institution at Walpole, entered the inmate cafeteria where, with his own tray empty, he sat at a table of Black Muslims, including one Irving 2X Jones who was their minister and leader. Another inmate, Frank Smith, entered the dining room shortly afterward, and the defendant thereupon left the cafeteria, remaining in the hall outside where he paced back and forth.  Several minutes later Smith departed the dining area and encountered the defendant in the hallway.   A number of guards were in the immediate vicinity of the confrontation and they all testified that the defendant twice stabbed Smith in the chest with a sharpened kitchen knife, shouting "Allah!" as he did so. Smith fell to the ground and was pronounced dead at 9:05 A.M. the same day.

The defense relied on a theory of insanity at the trial. One doctor had examined the defendant for the Commonwealth.  He was of the opinion that the defendant was criminally responsible at the time of the incident. Two psychiatrists testified for the defendant and described his conversion to the Muslim religion and his burgeoning obsession with the idea that Smith was a threat to that religion in general and to Jones, whom he had earlier threatened, in particular.   Their conclusion was that he was not criminally responsible for his assault on Smith.

We discuss the assignments of error seriatim, making such reference as may be necessary to additional testimony.

1. The defendant first alleges error in the denial by the trial judge of a pre-trial motion to inspect grand jury minutes.   He argues that such inspection was necessary because he was being held in the prison segregation unit, and neither he nor his counsel had ready access to inmates and to prison guards who might be potential witnesses.   The denial of this motion was not error.   He was

not entitled to inspection of grand jury minutes under the law in effect at the time of the trial in the absence of a showing of a "particularized need." *Commonwealth* v. *Carita,* 356 Mass. 132, 140 (1969). *Commonwealth* v. *DeChristoforo,* 360 Mass. 531, 534-535 (1971). *Commonwealth* v. *Stewart,* 365 Mass. 99, 102-104 (1974). The relaxation of that rule produced by the *Stewart* case is prospective only. *Commonwealth* v. *Stone,* 366 Mass. 506 (1974). A desire to obtain information general in nature to aid in preparing a defense and to discover that evidence which the Commonwealth possesses is not sufficient to establish particularized need. *Commonwealth* v. *Ladetto,* 349 Mass. 237, 245 (1965). *Commonwealth* v. *Cook,* 351 Mass. 231, 233 (1966). *Commonwealth* v. *Doherty,* 353 Mass. 197, 207-210 (1967), cert. den. 390 U. S. 982 (1968). While the defendant complains here of "strictures imposed upon his attorney in his investigation," no specific allegations of particularized need were made on presentation of the motion and none is made on appeal that the defendant or his attorney was denied access to any witness. *Commonwealth* v. *Balliro,* 349 Mass. 505, 515-516 (1965). *Commonwealth* v. *Carita,* 356 Mass. 132, 142-143 (1969). *Commonwealth* v. *Flynn,* 362 Mass. 455, 461 (1972). Had this been the case the proper procedure would have been the filing of a motion with the court to be allowed to interview a witness, *Commonwealth* v. *Carita, supra,* rather than to demand inspection of grand jury minutes. *Commonwealth* v. *Doherty, supra,* 207. In addition, the burden is on the defendant to demonstrate prejudice in the denial of the motion. *Commonwealth* v. *French,* 357 Mass. 356, 378 (1970), judgment vacated in part sub nom. *Limone* v. *Massachusetts,* 408 U. S. 936 (1972). *Commonwealth* v. *DeChristoforo,* 360 Mass. 531, 536, n. 2 (1971).

As we view the record, the defendant was provided with broad discovery, including the reports of prison guards, a list of the names of witnesses, and copies of

statements of witnesses to be relied on by the Commonwealth, as well as a list of names and addresses of witnesses who appeared before the grand jury. In fact, the
Commonwealth's answer indicates there was just one
such grand jury witness and he did not testify at trial. It
is questionable that even the liberalized *Stewart* rules
would require inspection in these circumstances. We are
not impressed by the defendant's suggestion of need based
on possible evidence of conspiracy which was never
introduced at trial. *Dennis* v. *United States,* 384 U. S.
855, 873-874 (1966).

2. The defendant complains of the denial of his motion
to prohibit the Commonwealth from employing a prior
conviction for rape to impeach his credibility were he to
testify, stating that this could serve only to prejudice him
because the conviction has no bearing on such credibility.
It is clear that under G. L. c. 233, § 21, witnesses may
be impeached by proof of prior conviction. This statute
applies to a criminal defendant testifying in his own
behalf. *Commonwealth* v. *Subilosky,* 352 Mass. 153,
167 (1967). *Commonwealth* v. *West,* 357 Mass. 245,
249 (1970). It is the function of the jury to consider the
degree to which the prior conviction bears on credibility.
*Quigley* v. *Turner,* 150 Mass. 108, 109 (1889). See
*Commonwealth* v. *West, supra.* The defendant contends
that while the statute might be applicable, due process
questions are raised by its use in these circumstances. This
has been rejected on numerous occasions in recent years.
*Commonwealth* v. *Ladetto,* 353 Mass. 746 (1967).
*Commonwealth* v. *DiMarzo,* 364 Mass. 669, 677-678
(1974). *Spencer* v. *Texas,* 385 U. S. 554, 563-564 (1967).
See *McGautha* v. *California,* 402 U. S. 183, 215 (1971).
In our view all that a defendant can request in the face
of the statute is a careful limiting instruction such as that
given by the judge in *Commonwealth* v. *Bumpus,* 362
Mass. 672, 682-683 (1972). See *Commonwealth* v. *Di
Marzo,* 364 Mass. 669, 678-683 (Hennessey, J., concur

ring) (1974); *Commonwealth* v. *Ferguson,* 365 Mass. 1, 11-12 (1974).

3. The defendant claims that he was placed in jeopardy twice for the same offense and by the same sovereign in being administratively punished in prison before trial. This claim is based on his confinement in a segregated unit at the Massachusetts Correctional Institution at Walpole immediately following the incident of December, 1971. He claims that this confinement constituted administrative punishment, and that consequently his trial on the murder indictment was a violation of the provision of the Fifth Amendment to the United States Constitution applicable to the States through the Fourteenth Amendment. *Benton* v. *Maryland,* 395 U. S. 784 (1969). *Gallinaro* v. *Commonwealth,* 362 Mass. 728, 736 (1973). See G. L. c. 263, § 7. The judge concluded that the defendant's confinement could not be characterized as punishment. He found that the "defendant and the other Black Muslims were, on the date of the killing . . ., removed to Blocks 9 and 10 for their own safety. In the judgment of the administration of M.C.I. Walpole, there was substantial tension at Walpole at that time, and the administration was fearful of trouble between the Muslim population and the non-Muslim black inmates in this institution — having in mind that the defendant was a Muslim and the deceased was a non-Muslim black inmate."

A review of the voir dire testimony on this point leads us to conclude that there was ample support for the judge's findings. The deputy superintendent of the prison, arriving there shortly after the stabbing, observed a group of approximately fifty non-Muslim blacks congregated outside the cell block where the Muslims were living. He concluded that the Muslims should be segregated because of the existing turmoil. The defendant strongly argues that by the end of the summer of 1972 all the Muslims save himself were transferred back to the general population, keeping him confined, he says,

for punishment rather than protection. The deputy superintendent testified, however, that the defendant was in danger of his life at that time and, in his opinion, would not have been safe in the general population. The judge could have concluded that a special need for protection existed. See *Smith* v. *Swenson,* 333 F. Supp. 1253, 1258 (W. D. Mo. 1971). As a general proposition, segregated confinement for lengthy periods is permissible to protect inmates whose presence in the general population would create unmanageable risks. G. L. c. 127, § 39. *O'Brien* v. *Moriarty,* 489 F. 2d 941, 944 (1st Cir. 1974). *Krist* v. *Smith,* 309 F. Supp. 497, 500 (S. D. Ga. 1970), affd. 439 F. 2d 146 (5th Cir. 1971). *Breece* v. *Swenson,* 332 F. Supp. 837, 843 (W. D. Mo. 1971). Block No. 10, where the defendant was confined, was not in fact a punishment unit, another block being reserved for that purpose. There was evidence that amenities available for the general population went along with residents in block No. 10, with certain exceptions. The conditions do not seem to us to have been so onerous as to have constituted punishment as distinct from necessary protective custody. A further factor in the situation was the occurrence of the serious disturbances in the prison in 1972 which restricted severely even inmates in the general population.

We conclude that the defendant was not punished administratively and that his trial for murder did not place him in double jeopardy. Further, we note in passing that even if his segregated confinement for almost fifteen months could be characterized as a form of punishment we know of no decisions in which the combination of administrative punishment of an inmate and his criminal conviction has been held to result in double jeopardy. In fact there are many decisions to the contrary. See, e.g., *United States* v. *Apker,* 419 F. 2d 388 (9th Cir. 1969); *United States* v. *Lepiscopo,* 429 F. 2d 258, 261 (5th Cir. 1970), cert. den. 400 U. S. 948

(1970); *Hutchison* v. *United States,* 450 F. 2d 930,. 931 (10th Cir. 1971).

4. The defendant argues that his right to have a speedy trial under both Federal and State law was violated. He relies on G. L. c. 277, § 72A, as well as on the Federal and State constitutional guaranties.

General Laws c. 277, § 72A, as appearing in St. 1965, c. 343, establishes a priority for a trial of defendants already in custody. *Commonwealth* v. *Lauria,* 359 Mass. 168, 171 (1971). *Commonwealth* v. *Stewart,* 361 Mass. 857, 857-858 (1972). *Commonwealth* v. *Gove,* 366 Mass. 351, 355 (1974). The first two paragraphs prescribe a procedure for a formal notification of the prisoner as to his indictment and his right to apply to the appropriate court for prompt trial or other disposition of the charges. The third paragraph states: "Any such prisoner shall, within six months after such application is received by the court, be brought into court for trial or other disposition of any such indictment, information or complaint, unless the court shall otherwise order."

The chronology of this case is of interest. An indictment on January 7, 1972, was followed by the defendant's motion for a speedy trial on February 11, 1972. At no time was an application pursuant to § 72A filed. But in the absence of an indication that the defendant was given notice of his right to apply, as required by the statute, we treat the motion for a speedy trial as satisfying the application requirement. Cf. *Commonwealth* v. *Gove,* 366 Mass. 351, 363 (1974). At a hearing on the motion on February 16, 1972, a judge asked defense counsel when he wished to have the case set down. The response was, the "earliest possible time," but defense counsel conceded the need of at least a month to prepare the case. No action was taken on the motion. It was left to the Commonwealth to ascertain from the Chief Justice of the Superior Court when the case might be assigned. In the course of the same hearing a number of discovery motions filed by the defense were allowed. On

May 8, 1972, after receiving the answers of the Commonwealth, defense counsel filed a motion to authorize expenses for psychiatric examination of the defendant. That motion was heard on May 22, 1972, at which time the judge raised the question of a trial date but, as the judge found, "counsel for the defendant asserted that a trial date was not desired at that time but should be put off until he had the opportunity to evaluate the future report of his psychiatrist." Defense counsel then agreed with the judge that after he had evaluated the material he would come forward with an application for a trial date. At the same time the judge acceded to the Commonwealth's request that in light of the defendant's plea for a psychiatric examination it too be permitted such an examination. The report of the Commonwealth's psychiatrist was filed on September 7, 1972, and on September 29, 1972, the defendant filed a motion for psychiatric records in connection with that report. A hearing on that motion was held on October 19, 1972. Finally, on January 31, 1973, defense counsel filed a motion to authorize further psychiatric expenses inasmuch as the one psychiatrist who had examined the defendant had been killed recently in an automobile accident. The motion was allowed at a hearing on February 2, 1973. The trial began on February 26, 1973.

It is evident from this timetable that although defense counsel never formally requested a continuance, "a substantial part of the delay . . . was obviously caused by him and, in addition, was for his benefit." *Commonwealth* v. *Loftis*, 361 Mass. 545, 549 (1972). The period of the alleged delay encompasses the successive hearings and the psychiatric examination requested by defense counsel who expressly acknowledged the resulting need to put off the trial date. See A. B. A. Standards Relating to the Administration of Justice, Speedy Trial, § 2.3 (a) and (c) (1974). It is also inclusive of the additional time required by the Commonwealth to respond to the insanity defense by undertaking its own psychiatric

examination of the defendant. See A. B. A. Standards Relating to the Administration of Justice, Speedy Trial, § 2.3 (d) (ii) (1974). We do not believe in the circumstances of this case that G. L. c. 277, § 72A, requires dismissal of the indictment. *Commonwealth* v. *Loftis,* 361 Mass. 545, 549 (1972).[1] However, we emphasize again, as we did in the *Loftis* case, that the advisable procedure in cases arising under § 72A is that the judge specifically order an extension of the statutory period, stating his reasons, where a delay is reasonably necessary and justifiable.[2]

The defendant also argues the denial of his constitutional right to a speedy trial under the Fourteenth Amendment to the Constitution of the United States (see *Klopfer* v. *North Carolina,* 386 U. S. 213, 222-223 [1967]), and under art. 11 of the Declaration of Rights of the Massachusetts Constitution. *Commonwealth* v. *Hanley,* 337 Mass. 384, 387 (1958), cert. den. 358 U. S. 850 (1958). Our constitutional analysis requires a balancing test, weighing four factors: "[l]ength of delay, the reason

---

[1] Since we conclude that the case is governed by the principles set forth in *Commonwealth* v. *Loftis,* 361 Mass. 545 (1972), we need not decide whether an indictment must be dismissed under G. L. c. 277, § 72A, in a situation where no action whatsoever has been taken by the judge or prosecution within six months after an application under the statute has been made. The Appeals Court in *Commonwealth* v. *Gove,* 1 Mass. App. Ct. 614 (1973), concluded that dismissal in that situation is required, but since the Commonwealth did not appeal that aspect of the case we had no occasion to consider the question in *Commonwealth* v. *Gove,* 366 Mass. 351 (1974).

[2] While the statute puts no explicit limits on the judge's discretion to order an extension of the statutory period, we do not believe that the Legislature intended that the discretion be unbridled; some element of reasonable justification should be present. See 1959 House Doc. No. 473; 1960 House Doc. Nos. 578, 584 and 3036; 1961 House Doc. Nos. 228 and 2157; 1961 Senate Doc. No. 563; 1963 House Doc. Nos. 1232 and 3406; 1963 Senate Doc. No. 813. For possible guidance as to what might justify delay, see A. B. A. Standards Relating to the Administration of Criminal Justice, Speedy Trial, § 2.3 (1974), and commentary in Approved Draft (1968).

for the delay, the defendant's assertion of his right, and prejudice to the defendant." *Barker* v. *Wingo,* 407 U. S. 514, 530-533 (1972). *Commonwealth* v. *Horne,* 362 Mass. 738, 741-742 (1973). *Commonwealth* v. *Gove,* 366 Mass. 351, 363 (1974).

The delay in this case from indictment to trial was slightly less than fourteen months. In *Commonwealth* v. *Gove,* 366 Mass. 351, 362 (1974), we concluded that a six months' delay was not excessive and noted that a nine months' delay seemed to be the minimum delay for which dismissal might be ordered. See *United States* v. *Butler,* 426 F. 2d 1275 (1st Cir. 1970), cert. den. 401 U. S. 978 (1971). The delay in this case is greater and is sufficient to trigger some concern. However, acceptable delay is proportional to the complexity of the issues in the case. *Commonwealth* v. *Gove,* 366 Mass. 351, 362 (1974). *Barker* v. *Wingo,* 407 U. S. 514, 531 (1972). In this case, involving an insanity defense with its requisite pre-trial psychiatric examinations, the amount of delay, while greater than the ideal, does not strike us as excessive. In our opinion much of the responsibility for the delay is to be laid at the door of the defendant and it is evident that defense counsel acquiesced in such delay as occurred.

In light of that fact, and while we do not applaud a delay of fourteen months in trial, we cannot accept the defendant's argument on this point. We discover no prejudice in the delay. The only prejudice alleged is based on the defendant's segregation of almost fifteen months in block No. 10 while awaiting trial, which we have already concluded was for the defendant's protection and, hence, was not the result of any trial delay. Any other deprivations remain "speculative and insubstantial." *Commonwealth* v. *Gove,* 366 Mass. 351, 365 (1974). The possibility of prejudice from the death of one of the defendant's psychiatrists, cf. *Dickey* v. *Florida,* 398 U. S. 30, 36 (1970), is slight, for two other psychiatrists testified in his behalf. Cf. *Commonwealth*

v. *Horne,* 362 Mass. 738, 745-746 (1973). We conclude that the defendant was not denied his constitutional right to a speedy trial.

5. The defendant lodges three objections to the expert testimony of Dr. James Christy, who testified for the Commonwealth on the question of the defendant's sanity at the time the offense was committed.

The first objection is that the doctor had insufficient grounds on which to render his opinion. He had testified to having examined the defendant and was then asked by the prosecution whether he had formed an opinion. He answered over the defendant's objection, and it is now argued that since he was not asked whether his opinion was based on reasonable medical certainty the jury may have considered expert opinion which rested on nothing more than conjecture. *Nass* v. *Duxbury,* 327 Mass. 396, 401 (1951). *Berardi* v. *Menicks,* 340 Mass. 396 (1960). *Milch* v. *Boston Consol. Gas Co.* 341 Mass. 230 (1960). We see no error. His opinion was stated in unequivocal terms and rested on his own personal observations. In these circumstances the expert witness is not required to state the grounds for his opinion. Attacks on its validity are open to the defendant on cross-examination or through his own witnesses. *Commonwealth* v. *Johnson,* 188 Mass. 382, 385-389 (1905). *Commonwealth* v. *Russ,* 232 Mass. 58, 73 (1919). *Greene* v. *Cronin,* 314 Mass. 336, 344 (1943). *Commonwealth* v. *Vaughn,* 329 Mass. 333, 335 (1952). See Wigmore, Evidence, § 675 (Chadbourn rev. 1940).

The defendant also tells us that Dr. Christy's qualifications were inadequate. It appeared that he had never taken the board examination in the psychiatric specialty since he lacked certain requirements of residency and training. It did appear, however, that he had been doing psychiatric work at the Bridgewater State Hospital for five years, serving as principal psychiatrist and then as assistant medical director and, finally, as acting director.

We have repeatedly stated that the question of an expert's qualifications is for the trial judge, and his determination will be reversed only on an abuse of discretion or error as matter of law. *Commonwealth v. Spencer*, 212 Mass. 438, 447-448 (1912). *Commonwealth v. Bellino*, 320 Mass. 635, 638 (1947). *Commonwealth v. Devlin*, 365 Mass. 149, 152 (1974). The criterion of the judge is whether the witness possesses sufficient skill, knowledge or experience in the field of his testimony that the jury may receive appreciable assistance from it. Wigmore, Evidence, § 1923 (Chadbourn rev. 1940). McCormick, Evidence, § 13 (2d ed. 1972). There was no error in this instance. Testimony on the issue of sanity does not necessarily require that the expert be a specialist in psychiatry. See *Commonwealth v. Rogers*, 7 Met. 500, 505 (1844); *Baxter v. Abbott*, 7 Gray 71 (1856); *White v. McPherson*, 183 Mass. 533, 534 (1903); *Lockhart v. Ferguson*, 243 Mass. 226, 229 (1922); Leach and Liacos, Handbook of Massachusetts Evidence, 97 (1967); Wigmore, Evidence, § 569 (Chadbourn rev. 1940); Rogers, The Law of Expert Testimony, § 176, p. 404 (1941); McCormick, Evidence, § 13 (2d ed. 1972). In fact, in a growing number of jurisdictions courts have permitted psychologists who are not physicians but who have special skill in the field of mental illness to give expert testimony on sanity. See anno. 78 A. L. R. 2d 919 (1961 and Supps. 1968 and 1974). The defendant relies on *Old Colony Trust Co.* v. *DiCola*, 233 Mass. 119, 125 (1919), in which it was said, "The mere fact that a witness is a surgeon or a physician does not of itself qualify him as an expert in mental diseases. It requires special skill and experience in the knowledge and treatment of such diseases to make a physician or surgeon competent to give his opinion on the subject." The court in *DiCola* also stated, in tune with our other cases, that the issue of whether the witness has that special skill and experience is left largely to the discretion of the trial judge. In this case we believe that Dr. Christy's experi-

ence as principal psychiatrist and assistant medical director at Bridgewater provides ample support for the judge's determination. See *Commonwealth* v. *Rogers*, 7 Met. 500, 505 (1844) (experts on insanity include those "who have had the care and superintendence of insane persons"); *White* v. *McPherson*, 183 Mass. 533, 534 (1903) (general practitioner who had treated upwards of one hundred insane persons qualified); *Lockhart* v. *Ferguson*, 243 Mass. 226, 229 (1922) (specialist in internal medicine who had practiced in mental diseases for seven to eight years qualified).

There is complaint that the judge failed to make a preliminary finding that Dr. Christy was qualified to testify as an expert on sanity. He argues that this failure means that the determination was left to the jury, which is reversible error. *Winthrop Prods. Corp.* v. *Elroth Co. Inc.* 331 Mass. 83, 84-86 (1954). *Willey* v. *Cafrella*, 336 Mass. 623, 624 (1958). However, it is evident from the transcript that the judge did in fact believe that Dr. Christy was qualified and made that belief fully known to counsel. The mere fact that he permitted the witness to give expert testimony implies such a finding. *Emery* v. *Tilo Roofing Co. Inc.* 89 N. H. 165, 169 (1937). *Paris* v. *Carolina Portable Aggregates, Inc.* 271 N. C. 471, 481 (1967). There is error only when the judge expressly leaves the matter to the jury. *Winthrop Prods. Corp.* v. *Elroth Co. Inc.* 331 Mass. 83, 84-86 (1954). Here the judge's silence would give a jury of laymen no reason to believe they were required to pass on the admissibility of the expert testimony; furthermore, the judge's subsequent charge made numerous references to all three psychiatrists as experts and, in fact, indicated that all three had been permitted to give their opinions only after the court found them qualified as experts.

6. It was not error to deny the defendant's motion for a directed verdict of acquittal. He argues that the evidence was overwhelming that his acts were motivated by other than a rational mind. But there was sufficient

evidence for the jury, who were charged in accordance with the test set forth in *Commonwealth* v. *McHoul*, 352 Mass. 544, 555 (1967), to find criminal responsibility beyond a reasonable doubt. A doctor testifying for the Commonwealth gave his opinion that at the time of the incident the defendant was criminally responsible within the meaning of the *McHoul* test. The jury could have believed the doctor and disbelieved the testimony of the defendant's psychiatrists. *Commonwealth* v. *Smith*, 357 Mass. 168, 178 (1970). *Commonwealth* v. *Costa*, 360 Mass. 177, 183 (1971). There was also evidence that the defendant was of average or above average intelligence and had no prior history of mental disease. There was also a description of his behavior on the day of the incident. A jury issue was thus presented on the question of sanity.

The requisite malice could also have been found from the defendant's intentional use of a deadly weapon, which gives rise to an inference of malice unless by the circumstances it is disproved. *Commonwealth* v. *Young*, 326 Mass. 597, 600 (1950). *Commonwealth* v. *Kendrick*, 351 Mass. 203, 209-210 (1966). *Commonwealth* v. *McCauley*, 355 Mass. 554, 559 (1969). In light of the evidence, the defendant was not entitled to a directed verdict.

7. During his cross-examination of one of the defendant's psychiatrists, the prosecutor asked the following question in reference to the Muslim religion: "Religious values of secondary importance, main concept is group solidarity — anti-white. A pro-Black feeling primarily?" The defendant objected to the question, and assigns its allowance as error, stating that it was irrelevant and highly inflammatory in its effect on an all white jury. Evidence is not admissible if its purpose is to prejudice the jury, but the burden is on the excepting party to show that this is so. *Godfrey* v. *Old Colony St. Ry.* 223 Mass. 419, 422 (1916). Here, on direct examination, the doctor had testified to the defendant's religious zeal, describing

his intense belief that the victim had to be removed in order to protect the Muslim movement and its minister, Irving 2X Jones, whom Smith had allegedly threatened. According to the doctor, the defendant believed that killing Smith would "please Allah." His opinion that the defendant was not criminally responsible at the time of the killing rested largely on his characterization of the defendant as a religious zealot. On cross-examination the prosecutor was entitled to test the basis of the expert's opinion on sanity. *Commonwealth* v. *Johnson*, 188 Mass. 382, 388-389 (1905). *Commonwealth* v. *Russ*, 232 Mass. 58, 77 (1919). *Greene* v. *Cronin*, 314 Mass. 336, 344 (1943). He adopted a line of questioning evidently designed to show that religious zeal was secondary to other goals in the movement. A challenge to the genuineness of the defendant's fervor would tend to weaken the expert's opinion on insanity. The prosecutor first asked whether the Muslim movement was primarily a religion or a political organization, to which the doctor replied that the defendant's description of it to him was not that of a political operation. The next question was that quoted. This does not appear to have been an inappropriate mode of cross-examination. We believe the trial judge to have been "in the best possible position to make the determination whether the prejudicial consequences of the introduction of the . . . [testimony] outweighed its probative value." *Commonwealth* v. *D'Ambra*, 357 Mass. 260, 264 (1970). When the question assailed is considered in its context, we conclude that neither its purpose nor effect was to prejudice the defendant so as to require the reversal of that determination.

8. The defendant raised a number of objections to the judge's instructions to the jury which separately and in toto are said to have resulted in prejudicial error. First, the defendant states his grievance that on two occasions the judge said to the jury that the defendant had killed the deceased, statements which invaded the jury's province to find the facts, and precluded the possibility

of a not guilty verdict. But these statements seem to have been made only in the course of the judge's charge on the insanity defense.[3] Read in that context, it appears that the judge was merely explaining what verdict to return in case certain facts were found. See *People* v. *Mattei*, 381 Ill. 21, 26-27 (1942); *State* v. *Worley*, 353 S. W. 2d 589, 595-596 (Mo. 1962). The language of any insanity charge stemming from *Commonwealth* v. *McHoul*, 352 Mass. 544, 546-547 (1967), will assume that the defendant has committed the act, for the defense does not come into play unless there is such a finding. *Commonwealth* v. *Heath*, 11 Gray 303, 304 (1858). *Commonwealth* v. *Costa*, 360 Mass. 177, 185-186 (1971). Here the judge was only stating facts which the jury might find as the context indicates. The judge subsequently stated that the jury were bound to return a not guilty verdict if not satisfied beyond a reasonable doubt of the defendant's guilt. Finally, even if the judge's statements were based on an assumption that the act occurred, that fact had been established by uncontroverted evidence as even defense counsel conceded in a summation in which he relied entirely on the defense of insanity. See *United States* v. *Terry*, 446 F. 2d 579, 582 (9th Cir. 1971), cert. den. 404 U. S. 946 (1971); *State* v. *Willits*, 96 Ariz. 184, 189 (1964); *People* v. *Mulford*, 385 Ill. 48, 59 (1943); *State* v. *Barbata*, 336 Mo. 362, 371-

---

[3] The judge stated:

"And you see what the distinction is. Not guilty by reason of insanity means that the act occurred. Okay. The defendant did stab Smith and Smith did die so that the act occurred, but at the time of the act you the jury determine in accordance with this test that the defendant was not responsible. In that respect you would be required to return a verdict of not guilty by reason of insanity. . . .

"You might say, 'Well, what about this business of the defendant not being proven beyond a reasonable doubt in your judgment to be criminally responsible? What does that mean that the jury has to do?' Well, you have in mind that the defendant has killed somebody and the question is whether or not he did it with or without legal justification."

375 (1935); *State* v. *Ham,* 259 S. C. 118, 136 (1972). In light of these considerations, we discern no prejudice.

The defendant holds that the judge effectively discredited the story he told the psychiatrists by implying that he might have put on "rose-colored glasses" in telling them of the incident. Our examination of the transcript indicates that this comment appears in the context of a general discussion of the credibility of witnesses wherein the judge indicates the possibility that in a given case an interested party might stretch a point. However the judge added, "I don't say that is the fact in this case, but you think of it, yes, you do." The judge paralleled his comments with a similar reference to the interest of the correctional officers in the outcome, mentioning the possibility that they too may have put on their "rose-colored glasses." There was no error. The judge was acting within his province. *Cahalane* v. *Poust,* 333 Mass. 689, 693 (1956). *Commonwealth* v. *Binkiewicz,* 342 Mass. 740, 752-753 (1961). *Commonwealth* v. *Bettencourt,* 361 Mass. 515, 521 (1972). This principle encompasses references to the possible bias of witnesses and applies to matters bearing on the credibility of statements of the accused himself. *Commonwealth* v. *Grace,* 265 Mass. 119, 124 (1928). *Commonwealth* v. *Shea,* 323 Mass. 406, 416 (1948). *Commonwealth* v. *Kleciak,* 350 Mass. 679, 692 (1966). The one case cited by the defendant, *Baglio* v. *New York Cent. R.R.* 344 Mass. 14, 20 (1962), is distinguishable, for in that case the judge actually told the jury not to be "misled" by certain testimony, plainly indicating the judge's belief that the witness had consciously misstated the facts. Nor was there error in alluding to the prosecution's attack on the credibility of Dr. Woodward, who had examined the defendant during the course of the trial when the defendant had an obvious interest in the outcome of the case.

In charging the jury on the presumption of innocence the judge instructed: "The presumption of innocence is not evidence, not evidence which you retain for the dura-

tion of the case up to and including your deliberation; the presumption of innocence is a presumption which, upon the introduction of evidence on the question of the guilt or innocence of this defendant, the presumption disappears and then you decide the case on the evidence." After objection by the defendant, the judge further instructed: "A presumption of innocence is not evidence for the jury in favor of a defendant. A presumption is not evidence but is a rule which governs until sufficient evidence to the contrary appears. . . . When sufficient evidence to the contrary appears, then you decide the case on the evidence, and the presumption is not considered thereafter." The defendant assigns this as error, contending that the judge must instruct that the presumption of innocence stays with the defendant until the jury are convinced of the defendant's guilt beyond a reasonable doubt.

The presumption of innocence has been aptly described as "a source of mysticism and confusion." McCormick, Evidence, § 309, p. 647 (1954). The presumption serves as a focus on the prosecutor's burden of producing evidence of guilt and persuading the jury of the guilt beyond a reasonable doubt. See *Carr* v. *State,* 192 Miss. 152, 156 (1941); Wigmore, Evidence, § 2511 (Chadbourn rev. 1940); Am. Law Inst., Model Penal Code, Proposed Official Draft (1962) § 1.12. Its function is to emphasize to the jury that "the finding of an indictment by the grand jury . . . [is] not to be regarded as . . . [a circumstance] tending to criminate the defendant or creating against him unfavorable impressions, and that he is not to be found guilty upon suspicion or conjecture but only upon evidence produced in court." *Commonwealth* v. *DeFrancesco,* 248 Mass. 9, 13 (1924). Wigmore, Evidence, § 2511 (Chadbourn rev. 1940). That point was fully amplified in the judge's instructions, and nothing more is required. *Commonwealth* v. *DeFrancesco, supra. Commonwealth* v. *Madeiros,* 255 Mass. 304, 316 (1926). *Commonwealth* v. *Devlin,* 335 Mass. 555, 569

(1957). The defendant's contention that the presumption must perforce continue after the introduction of evidence erroneously attributes to the presumption an evidentiary element. "It is settled that the presumption of innocence is not evidence and 'does not run with the defendant through the trial and continue with him through all its stages.' *Commonwealth* v. *Madeiros,* 255 Mass. 304, 316 [1926]." *Commonwealth* v. *Devlin,* 335 Mass. 555, 569 (1957). *Commonwealth* v. *Powers,* 294 Mass. 59, 64 (1936). The defendant makes much of the instruction sustained by the court in *Commonwealth* v. *Powers, supra,* at 63, where the judge charged: "It is only when the Commonwealth begins to introduce its evidence that the presumption in . . . [the defendant's] favor begins to disappear; as the evidence against him goes in, then the presumption grows less and less strong; and if, at the conclusion of the case, the Commonwealth has convinced you beyond a reasonable doubt of his guilt, then the presumption has disappeared entirely and your verdict should be 'Guilty.'" Yet in the *Powers* case it is evident that the court was not requiring the instruction and was, in fact, indicating that it was more favorable to the defendant than was required under *Commonwealth* v. *Madeiros,* 255 Mass. 304, 316 (1926). The judge's charge here too, in extending the presumption into the trial until "sufficient evidence to the contrary appears," would seem to have gone beyond what was required.

The defendant objected to the judge's instruction on manslaughter as blurring the distinction between guilty of voluntary manslaughter and not guilty by reason of insanity. The judge charged: "Ordinarily if a person becomes suddenly aroused by passion and, as the saying goes, loses his head or there is some provocation and a person retaliates to a show of force, or whatever is teasing the person, and he has the misfortune of killing someone, that is known as voluntary manslaughter and it is excused because of the weakness of human nature." Further on he told the jury that they must be satisfied

that as a result of provocation the defendant was "unable to control his action." The defendant suggests that if the defendant had "lost his head" or was "unable to control his actions," his conduct came within the test for lack of criminal responsibility, not voluntary manslaughter.

We do not believe that this instruction deviated substantially from the definition of manslaughter as "a killing from a sudden transport of passion or heat of blood, upon a reasonable provocation and without malice, or upon sudden combat." *Commonwealth* v. *Soaris,* 275 Mass. 291, 299 (1931). *Commonwealth* v. *Campbell,* 352 Mass. 387, 397 (1967). A temporary loss of self-control falls within this concept and is sometimes referred to in describing manslaughter. See *Commonwealth* v. *Ransom,* 358 Mass. 580, 583 (1971); Am. Law Inst., Model Penal Code, Proposed Official Draft (1962) § 210.3, commentary, Tent. Draft No. 9, p. 40 (1959); LaFave & Scott, Criminal Law, § 76 at 573 (1972). In our view the charge on manslaughter, if anything, was too favorable to the defendant. It is conceivable that some confusion could have resulted from a careless reference to the insanity defense in the course of the manslaughter charge. However, in so far as the jury might have drawn an improper inference from its mention, that inference would likely be that the jury might find manslaughter on the basis of diminished mental capacity, a proposition which we have rejected. *Commonwealth* v. *Costa,* 360 Mass. 177, 184-186 (1971). Cf. *Commonwealth* v. *Mazza,* 366 Mass. 30, 33-34 (1974). Furthermore, the rationale for a charge of manslaughter was that of a "continuing provocation" stemming from a threat made by the deceased to the Muslim minister, Irving 2X Jones, ten days prior to the killing, arguably intensified by the defendant's mental condition. We express doubt whether this sort of provocation could or did give rise to the sudden transport of passion required for manslaughter, especially since words alone do not provide a reasonable provocation. *Com-*

*monwealth* v. *Leate,* 352 Mass. 452, 458 (1967). Warren on Homicide § 95 (1938).

We do not see error in the judge's statement to the jury that the deceased represented no current threat to the defendant at the time of the incident, for the judge may properly rule on whether the evidence is sufficient to demonstrate particular circumstances warranting the verdict of manslaughter. *Commonwealth* v. *Campbell,* 352 Mass. 387, 392 (1967). *Commonwealth* v. *McCauley,* 355 Mass. 554, 559 (1969). *Commonwealth* v. *Caine,* 366 Mass. 366, 374-375 (1974). That ruling is supported by the evidence.

We conclude that the judge's instructions considered separately and together did not establish error.

9. Consonant with our duty under G. L. c. 278, § 33E, we have reviewed the record and transcript and find no grounds to order a new trial or direct a verdict of a lesser degree of guilt.

*Judgment affirmed.*