COMMONWEALTH *vs.* BRUCE DABRIEO.

Essex.    November 3, 1975. — August 3, 1976.

Present: HENNESSEY, C.J., QUIRICO, BRAUCHER, & KAPLAN, JJ.

*Practice, Criminal,* Directed verdict, Speedy trial, Disclosure of evidence. *Constitutional Law,* Speedy trial. *Inquest. Witness,* Refreshment of recollection. *Evidence,* Opinion: expert. *Homicide. Joint Enterprise.*

At a murder trial, testimony by a witness that he observed the defendant and the victim entering the victim's car, with the heads of the two men facing each other, that he saw "some flashes of a gun" and "heard like fire cracking noises," that the defendant told him the victim was dead, and that they drove the victim's car with the body in it to another location where they set it on fire, together with other evidence tending to incriminate the defendant, warranted the denial of the defendant's motion for a directed verdict. [734]

A defendant's constitutional right to a speedy trial was not violated by a delay of twenty-seven months between the date of the indictment and the commencement of trial where the first twelve months of the

delay were caused by defense counsel for the defendant's benefit, the next seven months were attributable to the Commonwealth's heavy caseload and shortage of staff, and most of the remaining delay was a result of his counsel's overcrowded court appearance schedule, where the defendant did not assert his right to a speedy trial until nineteen months after the indictment was returned, and where the defendant's assertion of prejudice caused by the delay was neither corroborated nor proved. [734-739]

Dismissal of an indictment was not required for lack of compliance with G. L. c. 277, § 72A, where at the time of the indictment the defendant was in jail awaiting trial on an unrelated charge and was not "serving a term of imprisonment" within the meaning of the statute. [739-741]

At a murder trial, there was no impropriety in allowing a prosecution witness, a police officer, to refresh his memory prior to testifying at the trial by reading a transcript of testimony given by him at the inquest into the victim's death. [741-742]

There was no error in the denial of motions for a mistrial and to dismiss the indictment on the ground that the prosecutor failed to disclose to the defendant prior to trial a written statement given by a witness to a police officer in which she attributed to a key prosecution witness several statements which differed from testimony given by the key witness at the trial, where the defendant learned of the written statement during the trial and extensively cross-examined her concerning it. [742-744]

At a murder trial, there was no error in the exclusion of a hypothetical question to a medical expert as to the cause of death of the victim where the question assumed facts not in evidence. [744-745]

At a murder trial, the judge did not err in instructing the jury on the theories of common design and joint enterprise despite the fact that only the defendant and not the coventurer was on trial. [745]

INDICTMENT found and returned in the Superior Court on January 7, 1972.

A pre-trial motion to dismiss the indictment was heard by *McLaughlin*, C.J., and the case was tried before *Connolly*, J.

After review was sought in the Appeals Court, the Supreme Judicial Court, on its own initiative, ordered direct appellate review.

*John C. McBride* (*Alfred P. Farese* with him) for the defendant.

*Richard J. Kelleher*, Assistant District Attorney, for the Commonwealth.

QUIRICO, J.  The defendant was indicted for the crime of murder in the first degree, tried and found guilty by a

jury of the crime of murder in the second degree, and sentenced to imprisonment for life at the Massachusetts Correctional Institution at Walpole. The trial was held under the provisions of G. L. c. 278, §§ 33A-33G. The case is now before us on the defendant's appeal. The record on appeal consists of a summary of the trial court record, a transcript of the evidence, and an assignment of alleged errors. The alleged errors which have been argued by the defendant in his brief relate to (1) certain motions made by the defendant prior to and during the trial which were denied, (2) certain evidentiary rulings made by the trial judge, and (3) an instruction given by the trial judge in his charge to the jury.[1] We hold that there was no error. Moreover, on review of the case under G. L. c. 278, § 33E, we conclude that there shall be no relief thereunder.

We summarize some of the evidence which the jury could have believed in arriving at their verdict, but we do not suggest that there was no evidence different from or inconsistent with that summarized.

On Saturday, March 27, 1971, about 5 P.M., the defendant and one Fred Szybiak, whom he had known for about ten years, met in Beverly and rode in the defendant's red Volkswagen automobile to a restaurant in Saugus. On arrival the defendant told Szybiak that he was going to see John McCormack (hereinafter referred to as the victim) and went into the restaurant. A few minutes later he came out and told Szybiak that they would have to meet the victim at 9 P.M. at the Roadhouse, a cocktail lounge in Peabody. They drove back to Beverly, separated for a short while and met again in Beverly about 6 P.M.

They then drove around in the defendant's car, with Szybiak driving, until they arrived at the Roadhouse about 8:45 P.M. There Szybiak remained in the car while the defendant walked toward the building and stopped at the victim's car, a Cadillac (variously described as being white

---

[1] Since not all the errors alleged by the defendant have been argued in his brief, those not argued are treated as waived. S.J.C. Rule 1:13, as amended, 366 Mass. 853 (1975). *Commonwealth* v. *Bys, ante,* 350 (1976).

beige, gray, silver blue, or blue in color), which was parked next to the entrance to the building. About this time the victim came out of the building, approached the defendant, and the two men talked. The defendant returned to his car and said to Szybiak, "Follow us." Szybiak did so, driving the defendant's car, while the defendant rode with the victim in his car. They went to an apartment complex in Peabody, arriving about 9:15 P.M. Szybiak parked the defendant's car about four or five car-lengths behind the victim's car. From his position in the defendant's car Szybiak saw and heard the following. The defendant and the victim left the victim's car and walked toward an apartment building, laughing and talking as they did so. They did not enter the building but returned to the victim's car, the victim entering on the driver's side and the defendant on the passenger's side, with the heads of the two men facing each other. Szybiak saw "some flashes of a gun" and he "heard like fire cracking noises . . . ." The defendant then got out of the victim's car, and as he did so he was tugging at the victim's hand.

The defendant went to his own car and told Szybiak that the victim was dead and said further, "We have to get the car out of there." He asked Szybiak to drive the victim's car. Szybiak entered that car on the driver's side and saw the victim's body on the floor of the passenger's side. He saw no movement by the victim, but he heard the sound of a bowel movement from him. He drove the victim's car and followed the defendant, who was driving his own car, to an area in Peabody known as Cedar Pond, where a YMCA camp was located. The two cars entered the road to the camp and continued to a clearing in a wooded area. The defendant indicated to Szybiak to park the victim's car in that area and Szybiak did so. The defendant told Szybiak that they had to get a can of gasoline because he wanted to burn the victim's car. With the defendant driving his car, they went to a filling station in Salem and purchased a couple of gallons of gasoline. They returned to the victim's car and, while Szybiak stood by, the defendant poured the gasoline into the victim's car and

threw a lighted match in the car causing the gasoline to explode.

The defendant then drove Szybiak to some point in Peabody where, for the first time that evening, Szybiak saw a gun in the defendant's possession. The two men took the gun apart after which the defendant placed a part of it under some rocks in a little creek while Szybiak threw the cylinder of the gun across a field. They then went to a restaurant in Swampscott where Szybiak overheard the defendant tell one Byron Vorgeas that "it was all taken care of." The actions of these two men later that night need not be described in detail. Briefly, they partook of some heroin at an apartment in Beverly, made some other stops, and then parted company about 12:30 A.M. on March 28, 1971, when the defendant dropped Szybiak off at the latter's apartment.

The evidence summarized to this point came primarily from the testimony of Szybiak, who accompanied the defendant throughout most of the evening of March 27, 1971. Certain other evidence merits mention.

A young man testified that he and a young lady were parked at the YMCA camp in Peabody about 10 P.M. on the evening of March 27, 1971, and that at that time he saw a red Volkswagen followed by a dark Cadillac enter the area and proceed further into a wooded area. At one point in his testimony he described the Cadillac as "dark colored," and at another point he described it as "white."

A State police trooper testified that about 11:10 P.M. on March 27, 1971, he observed the defendant's car in Salem, proceeding toward Beverly, with the defendant driving and Szybiak in the passenger's seat.

The victim's burned car, still smoldering, and the victim's body inside were found at the YMCA camp property on March 28, 1971. The medical examiner for Suffolk County who performed the autopsy testified that he "found the body to be badly charred with many heat fractures. . . . The body was so badly burned and charred that it was separated in two parts." On examination of the left side of the chest, he found a bullet embedded in muscle at

approximately the sixth rib, but because of marked char-
ring of the body he could not determine whether there
were any entrance or exit wounds caused by gunshot. It
was his opinion that the victim "came to his death as a
result of a gunshot wound to the chest, conflagration in
automobile with charring of body." A ballistician testified
that the bullet found in the victim's body was a .38 caliber
projectile.

About 6:20 P.M. on Sunday, March 28, 1971, the defend-
ant, Szybiak, and a third person were observed by police
officers in Peabody pushing the defendant's car toward a
filling station because it had run out of gasoline. At the
request of the officers the three men went to the police
station for questioning. The defendant was informed of his
rights under the decision in *Miranda* v. *Arizona,* 384 U.S.
436 (1966), after which he said that he understood his
rights and that he was willing to talk with the officers at
the station. When he was questioned by Lieutenant-Detec-
tive Leo McNulty of the Massachusetts State police about
the victim's death, the defendant admitted that he dealt in
narcotics for the victim and that he owed the victim money
for narcotics, but he said that the amount which he owed
the victim "wasn't very much." He admitted further that
he had seen the victim on the previous day, first at a res-
taurant in Saugus where they discussed the money which
he owed the victim, and then later in the parking lot of
the Roadhouse where, the defendant maintained, he paid
the victim the money and then left. The defendant denied
killing the victim, and he stated that Szybiak was with him
throughout the evening.

Visual examination and chemical testing of the defend-
ant, with his consent, by a police chemist disclosed the
presence of blood on his boots, on certain money in his pos-
session, and on his hands, upper arms, and upper chest.
The presence of blood was also detected on the hands and
arms of Szybiak.

One Kathleen Day Irving testified that the following
statements were made to her by the defendant. About a
week before March 27, 1971, he told her that he owed the

victim "a lot of money," that he, his wife and child were being threatened by the victim, that he didn't know what he was going to do about it, and that "[s]ooner or later it was going to come down . . . to him or [the victim], something was going to happen. He had no money to pay [the victim]." On March 28, 1971, the defendant inquired of her whether Szybiak was a trustworthy person and said that "he was very nervous about Szybiak . . . [a]nd that he couldn't leave loose things around." He requested that she tell anyone who talked to her that the victim called her at 9 P.M. on March 27, 1971, and that she not mention anything about a gun. He further told her that a "dope deal" involving herself, the defendant, the victim, and another person would not be going through because the victim "wouldn't be around," and when she inquired why, he replied that "it will be in the newspaper." In the summer of 1971 the defendant told her that "he was afraid and that he had to do with [the victim's] death," and further admitted to her that he shot the victim.

1. Having completed a summary of the pertinent evidence, we think this is an appropriate point at which to consider the defendant's contention that it was error to deny his motion for a directed verdict of not guilty. This contention is without merit. There clearly was sufficient evidence for submission of the case to the jury on the issue of the defendant's guilt. The defendant's argument on this subject concentrates principally on the claim that there were conflicts and inconsistencies in some parts of the evidence presented by the prosecution. Questions of weight and credibility of testimony are for the jury to resolve. *Commonwealth* v. *Montecalvo*, 367 Mass. 46, 54-56 (1975). *Commonwealth* v. *Medeiros*, 354 Mass. 193, 197 (1968), cert. denied, 393 U.S. 1058 (1969). The motion was therefore properly denied.

2. Another alleged error argued by the defendant is the denial of his motion to dismiss the indictment against him on the claim that he was prejudiced "because of the failure of the state to prosecute the case in a timely manner . . . ."

He was indicted on January 7, 1972, and the trial thereon commenced on April 2, 1974. The motion to dismiss was filed on August 14, 1973, it was heard by the chief justice of the Superior Court (herein referred to as the motion judge) on March 12, 1974, and his decision, with detailed findings of fact and rulings of law, was filed on March 28, 1974, ordering the motion denied. The same motion was renewed during the trial and it was again denied. We hold that there was no error in the denial of the motion on either occasion.

Although it appears from the part of the motion which is quoted in the paragraph above that it was based on a single ground, the order of the motion judge denying the motion treated it as though it were based on two grounds, the first being the alleged violation of the defendant's constitutional right to a speedy trial, and the second being the alleged violation of the defendant's rights under G. L. c. 277, § 72A. We therefore deal with each ground separately.

The time span between the date of the defendant's indictment on January 7, 1972, and the commencement of his trial on April 2, 1974, was approximately twenty-seven months. We have recognized in several of our recent decisions that while the length of delay in bringing a defendant to trial is a relevant factor in an inquiry whether he has been denied a speedy trial, it "is but one of several factors relevant to the inquiry." *Commonwealth* v. *Gilbert,* 366 Mass. 18, 21 (1974). *Commonwealth* v. *Gove,* 366 Mass. 351, 361 (1974). *Commonwealth* v. *Horne,* 362 Mass. 738, 743 (1973). In our opinion in the *Gilbert* case, *supra* at 21, we stated that " 'the reason for the delay, the defendant's assertion of his right, and prejudice' must also be weighed. *Barker* v. *Wingo,* 407 U.S. 514, 530 (1972) ."

In denying the defendant's pre-trial motion to dismiss, the motion judge made careful and detailed findings as to the reasons for the delay between indictment and trial in this case, and the portions of the delay which were attributable to the Commonwealth and to the defendant. The

defendant apparently does not dispute these findings, and we believe in any event that they are amply supported by the record in this case.

The motion judge found that the delay from the defendant's indictment on January 7, 1972, until January 11, 1973, a period of approximately twelve months, was caused by then defense counsel, Mr. Harry A. Simon, and was for the defendant's benefit. Mr. Simon, who represented the defendant diligently during this period, died on January 11, 1973, and on January 17, 1973, Mr. Alfred Farese was appointed to represent the defendant. The motion judge found that the period of seven months from approximately February, 1973, to August, 1973, was attributable to the Commonwealth and was due in large measure to a heavy caseload and shortage of qualified personnel in the office of the district attorney. On August 15, 1973, the prosecutor requested that a date for trial of the defendant be fixed by the chief justice of the Superior Court.

The motion judge found that the seven months' delay from September, 1973, through March, 1974, was caused by Mr. Farese's overcrowded court appearance schedule and by administrative difficulties in the office of the chief justice of the Superior Court in dealing with this schedule. Although he found that delay for a period of approximately three months, from mid-October to mid-January, was attributable to clerical errors in the chief justice's office, he further found in any event that during the entire seven months Mr. Farese was engaged in court appearances in several counties in the Commonwealth and therefore unavailable for trial of this case.

It is obvious from the record and from the motion judge's express findings that, while the Commonwealth was responsible for approximately ten months of the delay in this case,[2] the responsibility for the major portion of the

---

[2] As stated previously, the motion judge found that the Commonwealth was responsible for the seven months' period of delay from February, 1973, to August, 1973. In addition, the motion judge found that the three months' delay from mid-October, 1973, to mid-January, 1974 was attributable to the office of the chief justice of the Superior

twenty-seven months' delay from indictment to trial "is to be laid at the door of the defendant." *Commonwealth* v. *Boyd,* 367 Mass. 169, 180 (1975). See *Commonwealth* v. *Loftis,* 361 Mass. 545, 549-550 (1972). While we in no sense condone a delay of ten months on the part of the Commonwealth, we point out the motion judge's express finding, which is supported by the record, that "there is no basis in the record for viewing ... [the seven months of delay from February, 1973, to August, 1973, which was directly attributable to the Commonwealth] as a deliberate attempt to delay the trial in order to hamper the defense." *Barker* v. *Wingo,* 407 U.S. 514, 531 (1972).

Moreover, in determining the extent to which the defendant asserted his right to a speedy trial, we view as significant his failure to take any action to accelerate progress of the case from indictment to trial prior to August 14, 1973, when he filed his motion to dismiss. In this regard, we have noted recently that a motion to dismiss may be considered in some circumstances to be "the functional equivalent of a specific demand for speedy trial." *Commonwealth* v. *Gove,* 366 Mass. 351, 363 (1974). However, the fact that the motion to dismiss in the present case was not filed for more than nineteen months after the indictment was returned bears directly on the question whether the defendant met his "responsibility to assert his right." *Barker* v. *Wingo,* 407 U.S. 514, 531 (1972). *Commonwealth* v. *Gilbert,* 366 Mass. 18, 23 (1974).

The defendant claims that as a result of the delay he was prejudiced by being forced to endure a prolonged period of incarceration and suffering resultant stress and anxiety, and his defense was severely prejudiced by the death

Court. While we have serious doubts, in view of the motion judge's findings as to Mr. Farese's unavailability for trial during this period, whether the delay of three months attributed to the office of the chief justice resulted in any actual prejudice to the defendant, we assess that period of delay against the Commonwealth for purposes of this decision. However, we weigh it less heavily than we would "[a] deliberate attempt to delay the trial in order to hamper the defense." *Barker* v. *Wingo,* 407 U.S. 514, 531 (1972). *Commonwealth* v. *Gove,* 366 Mass. 351, 362 (1974).

or unavailability of several alibi witnesses who would have testified that the defendant was present at a party on March 27, 1971, at the time the victim was killed. Once again, we view as extremely relevant to the question of prejudice, particularly that allegedly resulting from incarceration, stress, and anxiety, the extent of the delay which was attributable to the defendant himself and his failure to accelerate progress by a demand for speedy trial or other effective assertion of his right for a period of nineteen months following his indictment. *Commonwealth* v. *Gilbert,* 366 Mass. 18, 23 (1974). *United States* v. *Brown,* 495 F.2d 593, 600 (1st Cir.), cert. denied, 419 U.S. 965 (1974). In *Commonwealth* v. *Gove,* 366 Mass. 351, 363 (1974), we stated: "[T]he court must consider demand or lack of demand [for speedy trial] to be an indication of the severity of prejudice to defendants. As the Supreme Court wrote, 'The more serious the deprivation, the more likely a defendant is to complain.' *Barker* v. *Wingo, supra,* at 531." Indeed, the defendant's extended inaction in this case strongly indicates, as the motion judge found, that the defendant "did not want to be tried," but rather "hoped to take advantage of the delay in which he acquiesced and thereby obtain a dismissal of the charge."

Further, we agree with the Commonwealth that the defendant's assertion as to unavailability of witnesses was neither corroborated nor proven. The defendant utilized an investigator appointed for him by the court in order to locate persons who allegedly could provide an alibi for him. It is clear from the testimony of the investigator, however, that his investigation was not undertaken with any great effort, and we therefore do not consider its results to be particularly reliable. Morever, as was stated in *United States* v. *Brown,* 495 F.2d 593, 600 (1st Cir.), cert. denied, 419 U.S. 965 (1974): "In view of the abundance of direct evidence produced against him at trial, the defendant must do more to establish prejudice than baldly assert that 'witnesses who obviously will testify in other areas can corroborate my innocence.' "

For the reasons stated above, we conclude that the

defendant's constitutional right to a speedy trial was not violated or denied by reason of any unreasonable or otherwise improper delay in bringing him to trial.

Although what we have said is sufficient to dispose of the defendant's claim that he was denied his constitutional right to a speedy trial, it does nothing to correct the situation which the motion judge found to be the principal cause of that part of the delay which he attributed to the defense in this case. He found in part: "The services of Attorney Farese have been in great demand by defendants facing indictment for capital cases and serious felonies. His office is understaffed to handle the volume of criminal business which flows through it. Many of the clients insist upon [his] personal services. [He] has conscientiously and with professional responsibility attended to his trial commitments to the best of his limited ability. *The best of his ability is completely inadequate*" (emphasis supplied). The motion judge then described the difficulties he has encountered in scheduling trials for the numerous defendants represented by that lawyer and how that situation contributed to the delay in the trial of the present case.

Trial judges are not powerless to act when faced with such a situation. It is certainly within their power (a) to refuse to make further assignments to a lawyer who attempts to take on more clients than he reasonably and properly can represent, and (b) to refuse to permit such a lawyer to file appearances for additional clients. It is not an acceptable answer for such a lawyer or his clients to say that the clients are content to have their trials delayed until that particular lawyer is free to try them. The public too has an interest in having criminal cases tried reasonably soon after they are commenced. The trial judge is as much responsible for protecting that right of the public as he is for protecting the right of the individual defendant to a speedy trial, and he should be ever vigilant to prevent any lawyer from either serving, or permitting himself to be used, as the instrument by which trials of pending cases are unreasonably delayed.

The defendant contends additionally that his motion to

dismiss the indictment should have been allowed because of the alleged failure on the part of a public officer or employee to comply with the notice requirements of G. L. c. 277, § 72A, as appearing in St. 1965, c. 343, reproduced in pertinent part in the margin.[3] We disagree.

At the time of the defendant's indictment in this case on January 7, 1972, and continuing at the time of his arraignment thereon on January 21, 1972, the defendant was being held in custody at the Lawrence house of correction awaiting trial on an unrelated armed robbery charge. He was ordered held without bail on the present indictment and was committed to the same house of correction pending trial. General Laws c. 277, § 72A, is not applicable in these circumstances because the protection which it affords applies only to a "prisoner serving a term of imprisonment," i.e., one serving a sentence on a charge on which he previously has been convicted, and not to one who is being detained while awaiting trial. While it is true that, in several decisions (*Commonwealth* v. *Boyd*, 367 Mass. 169, 177 [1975]; *Commonwealth* v. *Gove*, 366 Mass. 351, 355 [1974], and *Commonwealth* v. *Stewart*, 361 Mass. 857, 858 [1972]), we referred to § 72A as a statute which establishes a priority for trials of defendants who are already in custody, our language in those decisions did not operate to enlarge the precise and limiting words of the statute where it refers to "any prisoner serving a term of

---

[3] General Laws c. 277, § 72A, provides in pertinent part: "The commissioner of correction, the sheriff, master or keeper of a jail or house of correction, or in Suffolk county, the penal institutions commissioner of the city of Boston, shall, upon learning that an untried indictment, information or complaint is pending in any court in the commonwealth against any prisoner serving a term of imprisonment in any correctional institution, jail or house of correction, which is under his supervision or control, notify such prisoner in writing thereof, stating its contents, including the court in which it is pending, and that such prisoner has the right to apply, as hereinafter provided, to such court for prompt trial or other disposition thereof.

. . . .

"Any such prisoner shall, within six months after such application is received by the court, be brought into court for trial or other disposition of any such indictment, information or complaint, unless the court shall otherwise order."

imprisonment in any correctional institution, jail or house of correction." See *Commonwealth* v. *Underwood,* 3 Mass. App. Ct. 522, 524-525 (1975). For other cases citing § 72A, but not on the issue decided above, see *Commonwealth* v. *Daggett,* 369 Mass. 790, 792-793 (1976); *Commonwealth* v. *Carr,* 3 Mass. App. Ct. 654, 656-657 (1975); and *Commonwealth* v. *Parry,* 1 Mass. App. Ct. 730, 734-735 (1974).

3. The defendant next assigns as error the denial of his motion for a mistrial made after learning on cross-examination of one of the Commonwealth's witnesses that the prosecution had permitted the witness, a police officer, to refresh his memory prior to testifying at the trial by permitting him to read the transcript of testimony given by that same witness at the inquest which had been conducted into the death of the victim. Relying exclusively on the decision of this court in *Kennedy* v. *Justices of the Dist. Court of Dukes County,* 356 Mass. 367 (1969), the defendant contends that such action on the part of the Commonwealth constituted "improper and unauthorized possession and use" of the inquest transcript and that therefore his motion for a mistrial should have been granted. We disagree.

It is eminently clear from a reading of the *Kennedy* case (at 375-378) that our primary concern therein was the risk of prejudice to defendants in criminal proceedings from pre-trial publicity relating to the conduct and proceedings of a prior inquest. The general principles which we enunciated in the *Kennedy* case (at 377-378), in so far as they provide for the impoundment of and limitation of public access to inquest documents on completion of an inquest, are directed toward minimizing this risk of prejudice, and in no way may be taken to proscribe the possession of the inquest transcript by the Commonwealth or the manner of its use in the present case, where no such risk existed. Indeed, with regard to possession of the transcript, it is expressly provided in the *Kennedy* case (at 378) that "[w]hile these papers remain impounded, access to the report and transcript shall be afforded ... [to] the appropriate District Attorney, and to counsel for any per-

son who has been stated in the report as having actual or possible responsibility for the decedent's death . . . ." It is undisputed that both the district attorney and the defendant were provided with a copy of the inquest transcript in this case.

In the *Kennedy* case we were not faced with, nor did we pass on, the propriety of using the inquest transcript of the testimony of a witness to refresh the memory of that same witness when he is called to testify on the same subject at a later trial. However, we did say (at 378) that "any witness at the inquest shall be permitted, through counsel or directly, to check the accuracy of the transcript of his own testimony and to file . . . any suggested corrections." Moreover, with respect to possible uses of the transcript at a later trial, we said (at 374): "It may be that, to show an admission or confession at an inquest or to prove the prior inconsistent statement of a witness, some evidence at an inquest will be admissible at later criminal proceedings in accordance with usual principles of the law of evidence." We can see no reason for prohibiting the Commonwealth or the defendant from allowing a witness to review his inquest testimony in order to refresh his memory in preparing to testify at trial.

4. The next alleged error argued relates to the motion judge's denial of a motion made by the defendant, while the trial was in progress, for a mistrial and the dismissal of the indictment. This motion was based on the claim that in violation of a pre-trial order the prosecutor failed to inform the defendant that on February 25, 1974, Kathleen Day Irving, a prosecution witness, had given a police officer a written statement in which she attributed to Szybiak several statements which differed in some respects from the testimony which he later gave at the trial of this case.[4] The defendant contends that by its failure to inform

---

[4] In his testimony at the trial Szybiak said, in part, (a) that while he was driving the victim's car from the scene of the shooting in Peabody to the YMCA camp he saw no movement of the victim's body but he heard a sound like that of a bowel movement come from the body, and (b) that when he and the defendant returned from a filling station

him of this statement the Commonwealth violated his constitutional rights under the decisions in *Brady* v. *Maryland,* 373 U.S. 83 (1963), and *Giles* v. *Maryland,* 386 U.S. 66 (1967). We hold that in the circumstances of this case there was no error in the denial of the motions.

The basic learning to be had from a study of the long line of cases on this subject decided by the United States Supreme Court, starting with *Brady* v. *Maryland, supra,* and ending with the decision on June 24, 1976, in *United States* v. *Agurs,* 427 U.S. 97, 107-114, was summarized in part in the following statements from the opinion in the latter case: "[T]he prosecutor will not have violated his constitutional duty of disclosure unless his omission is of sufficient significance to result in the denial of the defendant's right to a fair trial. . . . The mere possibility that an item of undisclosed information might have helped the defense, or might have affected the outcome of the trial, does not establish 'materiality' in the constitutional sense. . . . It necessarily follows that if the omitted evidence creates a reasonable doubt that did not otherwise exist, constitutional error has been committed. This means that the omission must be evaluated in the context of the entire record. If there is no reasonable doubt about guilt whether or not the additional evidence is considered, there is no justification for a new trial." For decisions by this court applying substantially the same test, see *Commonwealth* v. *Hurst,* 364 Mass. 604, 607-609 (1974), *Commonwealth* v. *Roberts,* 362 Mass. 357, 361-363 (1972), *Commonwealth* v. *Earl,* 362 Mass. 11, 14-16 (1972), and *Commonwealth* v. *Beneficial Fin. Co.,* 360 Mass. 188, 315-318 (1971), cert. denied, 407 U.S. 910, and 407 U.S. 914 (1972).

It is clear from the record in this case that the defendant

---

in Salem to the place where they had left the victim's car, with the victim's body inside, the defendant poured gasoline into the victim's car and then set fire to it. In the statement given to the police by Irving on February 25, 1974, she said that Szybiak had told her (a) that the victim was not dead when Szybiak drove from the scene of the shooting in Peabody to the YMCA camp in Salem, (b) that while on that drive he had to kick the victim's body a couple of times, and (c) that he poured the gasoline into the victim's car and set fire to it.

became aware of Irving's statement of February 25, 1974, sometime during the trial, and that he was permitted to examine Irving exhaustively on her conversations with Szybiak and particularly on the conversation in which the defendant claims that Szybiak said that he poured gasoline in the victim's car and then lit it. It is equally clear that to the extent that Irving's testimony about what Szybiak told her differed from what Szybiak testified he had done, the Irving testimony was admitted only for the purpose of impeaching Szybiak's testimony, and not for any other purpose. Furthermore, the trial judge conducted a hearing, without the jury present, on the defendant's motions and then made detailed findings and rulings and concluded "that the failure of the Commonwealth to give to the defendant a copy of the statement made by Kathleen Day Irving on February 25, 1974, was not prejudicial." The evidence supported his findings, and the conclusion was warranted on the facts found.

In view of the finding that the defendant suffered no prejudice in relation to the failure of the prosecutor to inform him of the statement of February 25, 1974, we need not consider the remaining contentions relative to this assignment of error as we deem them either lacking in substance or unnecessary to decide.

5. The defendant contends that the trial judge erred in excluding the following hypothetical question during the defendant's examination of Dr. George Curtis, one of the prosecution's expert medical witnesses: "Now assuming evidence would show that that person [the victim] who was later burned had been at some time alive, and had been kicked prior to being burned, would that aid you then in determining whether the bullet wound caused this death or not?" The question was properly excluded.

A proper hypothetical question "must be based on evidence that has been or will be introduced." *MacKay* v. *Ratner*, 353 Mass. 563, 567 (1968). The question which was excluded in this case asked the expert witness to assume that the victim had been shot, and then while still alive had been kicked, and then burned. There was evi-

dence that the victim was indeed shot and later burned, but there was never any evidence admitted to prove the claimed fact that he had been kicked. The only reference to any kicking of the victim was in the statement of Irving on February 25, 1974, which was admitted only to impeach Szybiak's prior testimony. The Irving statement "for any purpose except its bearing upon [Szybiak's] credibility, was hearsay, inadmissible in any event, to prove the facts then stated." *Wheeler* v. *Howes,* 337 Mass. 425, 427 (1958). The hypothetical question therefore was properly excluded. See *Commonwealth* v. *Rucker,* 358 Mass. 298, 299-300 (1970); *State Tax Comm'n* v. *Assessors of Springfield,* 331 Mass. 677, 684-685 (1954).

6. The defendant lastly contends that the trial judge committed error in giving an instruction to the jury on the theories of "common design and joint enterprise." There was evidence which, if believed, would permit the jury to find that the defendant and Szybiak were engaged in a "common design [or] joint enterprise" in the events which resulted in the death of the victim and that therefore the instruction was warranted. The mere fact that the defendant alone and not the defendant and Szybiak were on trial does not render the instruction improper. See *Commonwealth* v. *Blow, ante,* 401, 407 (1976). We note that the defendant does not contend that the instruction was not legally correct as given, but only that it should not have been given.

7. We have reviewed the case on the law and the evidence as required by G. L. c. 278, § 33E, and we conclude that the verdict was neither against the law nor against the evidence and that the interests of justice require neither a new trial nor the entry of a verdict of a lesser degree of guilt than that found by the jury.

*Judgment affirmed.*