COMMONWEALTH *vs.* DONALD J. LOOK.

Plymouth. November 5, 1979. — March 4, 1980.

Present: HENNESSEY, C.J., QUIRICO, KAPLAN, WILKINS, & ABRAMS, JJ.

*Constitutional Law,* Speedy trial, Admissions and confessions. *Practice, Criminal,* Speedy trial, Probable cause hearing, Admissions and confessions. *Eavesdropping. Evidence,* Intercom system.

A four-and-one-half year delay between the indictment of a defendant and his trial and the failure of the Commonwealth to offer any reasons for such a delay were not sufficient to warrant dismissal of the indictment where the defendant failed to assert his right to a speedy trial during most of the delay and failed to show prejudice resulting therefrom. [897-903]

There was no merit to a defendant's contention that the judge at the defendant's murder trial erred in admitting a witness's testimony as to telephone conversations she had with the victim on the night of the homicide and with the defendant a few days later on the ground that the defendant was unfairly deprived of discovery during the probable cause hearing in a District Court by the fact that the judge sustained

the Commonwealth's objection as the witness was about to testify about the substance of at least one of the conversations. [903-905]

The fact that a police officer, when testifying at a probable cause hearing as to warnings given the defendant, omitted the right to remain silent, did not require suppression of the defendant's statements at his trial where the officer testified at trial that he had given all the warnings and where the defendant had previously been given the Miranda warnings and had voluntarily and knowingly waived them. [905-906]

At a hearing on a pretrial motion to suppress statements made by the defendant, there was sufficient evidence to support the judge's finding that, although the defendant was emotionally upset at the time of the statements, he had knowingly and voluntarily waived his Miranda rights. [906-907]

Where desk officers at a police station overheard a defendant's conversation with the chief of police by an intercom which they had switched on because of their concern that the defendant might act in a violent manner, there was no violation of either G. L. c. 272, § 99, or 18 U.S.C. §§ 2510 et seq. (1976), the State and Federal eavesdropping statutes, and there was no error in the admission at trial of any of the defendant's statements. [907-910]

There was no merit to the contention of a defendant who claimed he had shot his wife accidentally while cleaning a shotgun that there was error in the admission of the shotgun because of a question whether the gun was in the same condition as it was on the night of the homicide more than four years earlier. [910-911]

INDICTMENT found and returned in the Superior Court on May 29, 1974.

The case was tried before *Travers*, J.

After review was sought in the Appeals Court, the Supreme Judicial Court, on its own initiative, ordered direct appellate review.

*Melvin S. Louison* for the defendant.

*John P. Corbett*, Assistant District Attorney, for the Commonwealth.

QUIRICO, J. On November 1, 1978, a Superior Court jury convicted Donald Look of second degree murder for the killing of his wife on January 28, 1974. Look appeals pursuant to G. L. c. 278, §§ 33A-33G, claiming violation of his right to a speedy trial, and error in the admission of certain evidence. We affirm his conviction.

We summarize the evidence. On January 28, 1974, the defendant and his wife, the victim Susan Look, were at home in Rochester, Massachusetts. Together they operated a dog kennel and a campground, and their home was on the premises of the kennel. Look testified that at approximately 10 P.M. that evening, while the victim was watching television, he went to the basement of his home to obtain a shotgun he wished to clean. He returned to the dining room to clean the gun. Shortly thereafter, the gun discharged and his wife suffered a wound to her abdomen. Look called an ambulance, which took the victim to Tobey Hospital in Wareham, where she died at about 11:30 P.M. as a result of the gunshot wound. Look asked to see his wife, and became extremely upset. Police officers tried to restrain him, and he struck one officer in the face while resisting. Wareham police read Look his Miranda rights at the hospital, and he signed a form waiving those rights. Look was taken to the Wareham police station, where he and the chief of police, Walter A. Pierce, proceeded to the interrogation room. They remained there until 2:45 A.M. Look told Pierce that he had had an argument with his wife, had gone to get his shotgun to clean it, and had shot his wife accidentally. Four officers at the front desk overheard Look's conversation with Pierce via an intercom. Neither Look nor Pierce knew that the officers were listening, and neither expressly consented thereto. Two of the officers said at a pretrial hearing that they heard Pierce tell Look not to tell the State Police that he and his wife had had an argument. The Commonwealth did not offer as part of its case-in-chief at trial any testimony regarding the overhearing of this conversation between Look and Pierce. It did, however, offer Pierce's testimony as to the substance of his conversation with Look. Pierce testified that he told Look, "Don't keep torturing yourself, it was an accident," in response to Look's repeated exclamations that he had killed his wife. Pierce claimed he was attempting to "calm him [Look] down." Pierce neither arrested Look nor charged him with any crime.

Two State police officers, Lieutenants Masuret and Carr, arrived shortly thereafter, and the desk officers told them of

the overheard conversation. The two lieutenants went into
the room alone with Look, gave him his Miranda warnings
again, and questioned him for more than two hours. Look
repeated several times that he had shot his wife accidental-
ly, while cleaning his gun to go hunting. He was formally
booked at 5 A.M. on January 29. Pierce, Masuret and Carr
all testified at trial that Look seemed emotionally upset dur-
ing many parts of the two interrogation periods.

Look was indicted on May 29, 1974, after a probable
cause hearing on May 17 in a District Court. Numerous
pretrial motions occupied the parties' time from June, 1974,
to March, 1975, and the following occurred thereafter:

(1) On March 17, 1975, a Superior Court judge granted a
pretrial motion to suppress certain statements of the victim.

(2) On March 26, 1975, the Commonwealth filed an ap-
plication in this court for an interlocutory appeal of the sup-
pression order, pursuant to G. L. c. 278, § 28E. A single
justice of this court dismissed the application on November
22, 1975, for lack of prosecution, and the Commonwealth
did nothing further until November 2, 1977, when it filed a
motion to vacate the dismissal. This motion was denied on
November 22, 1977.

(3) On March 27, 1978, the Commonwealth filed a re-
quest in the Superior Court for a trial assignment. On April
5, 1978, Look filed a motion to dismiss for lack of a speedy
trial, the first such action Look took to assert his Sixth and
Fourteenth Amendment right to a speedy trial. After a
hearing, the trial judge filed findings and rulings denying
the motion to dismiss.

Look's trial commenced on October 19, 1978, and about
that time Look filed the following three pretrial motions to
suppress:

(1) The first such motion sought to suppress the state-
ments Look gave Masuret and Carr, and was based on the
grounds of inadequate Miranda warnings and incapacity to
waive Miranda rights due to "a highly emotional state."

(2) The second motion was to suppress the testimony of
one Vivian Ivers, the victim's stepmother. The defense had

called Ivers at the 1974 probable cause hearing. Ivers had begun to testify about a telephone call she received from the victim on the night the victim died. The Commonwealth objected and defense counsel, while first arguing against admissibility of the victim's statements to Ivers, said, "[I]f there is going to be some evidence that it is admissible . . . then I think the whole picture should be before the Court." The judge sustained the Commonwealth's objection. At the trial, however, the Commonwealth sought to introduce Ivers' testimony about the substance of the telephone conversation.

(3) The third motion to suppress involved the conversation between Pierce and Look, and "evidence derived therefrom," on the grounds that the desk officers electronically intercepted the conversation in violation of State and Federal wiretap statutes. G. L. c. 272, § 99, and 18 U.S.C. §§ 2510 et seq. (1976).

The judge, after hearings, denied all three motions. At trial, Ivers testified that at approximately 10:30 P.M. on January 28, 1974, she received a call from the victim, who said, "Why did you tell Donald that I had a baby at Tobey Hospital," and "I don't think it's fair[;] I'm getting out of here."[1] She also testified (with corroboration from another witness) that the victim, shortly before her death, had talked of divorcing Look.

1. Look asserts that he was denied his Sixth Amendment right to a speedy trial, as applied to the States through the Fourteenth Amendment, *Klopfer* v. *North Carolina,* 386 U.S. 213, 222-223 (1967), and his analogous right under art. 11 of the Massachusetts Declaration of Rights. *Commonwealth* v. *Green,* 353 Mass. 687, 690 (1968). The analysis of this claim necessitates a balancing of four factors:

---

[1] There was a great deal of testimony about the substance of the argument Look had with the victim just before the shooting. Look told Carr and Masuret it had concerned mating dogs in the kennel. Look himself testified that there had been a discussion at about 10 P.M. on the night of the homicide about adopting a Vietnamese baby, and that he had asked the victim if it was true she had borne a child prior to their marriage.

(1) length of the delay, (2) reasons for the delay, (3) asser-
tion of the right, and (4) prejudice to the defendant. *Barker
v. Wingo,* 407 U.S. 514, 530-533 (1972). *Commonwealth
v. Dabrieo,* 370 Mass. 728, 735 (1976). *Commonwealth* v.
*Gove,* 366 Mass. 351, 361-365 (1974).

a. *Length of delay.* In the present case the right to a
speedy trial attached at the time Look was indicted, since he
was not in custody prior thereto. *United States* v. *Marion,*
404 U.S. 307, 320-321 (1971). *Gove, supra* at 357. *Com-
monwealth* v. *Campbell,* 5 Mass. App. Ct. 571, 581-582
(1977). The length of delay from that date, May 29, 1974,
to the commencement of trial on October 19, 1978, is un-
questionably sufficient to "trigger" further inquiry into
whether Look was denied a speedy trial in violation of his
constitutional rights. See *Commonwealth* v. *Beckett,* 373
Mass. 329, 331-332 (1977) (fifty-five months' delay); *Com-
monwealth* v. *Boyd,* 367 Mass. 169, 179-180 (1975) (four-
teen months' delay); *Commonwealth* v. *Horne,* 362 Mass.
738, 739, 743 (1973) (forty-eight months' delay). In looking
to the other three factors delineated in *Barker, supra,* we
weigh each in the circumstances of this case, keeping in
mind that the defendant bears the burden of showing preju-
dicial delay sufficient to warrant dismissal of the indictment
against him. *Commonwealth* v. *Gilbert,* 366 Mass. 18, 22
(1974). *Commonwealth* v. *Jones,* 360 Mass. 498, 502 (1971).
The length of delay here is clearly to be weighed against the
Commonwealth, absent an adequate explanation for that
delay.

b. *Reasons for delay.* The Commonwealth has offered
no reasons whatsoever for the inordinate delay in this case,
and thus the defendant was apparently forced to resort to
speculation in order to meet his burden on this question.[2]

---

[2] We note parenthetically that, as Look's counsel mentioned in argu-
ment before this court, a defendant is not privy to the administrative deci-
sions of the district attorney's office and must therefore be content, under
the present system, with whatever he can glean through discovery. The
new Massachusetts Rules of Criminal Procedure relieve the defendant of
this difficulty to some degree by shifting the burden to the Commonwealth

The judge found that "[t]he Commonwealth, through the Plymouth County District Attorney's Office . . . was responsible for the delay in bringing the defendant to trial. There is no explanation of the delay in the record."[3] Accordingly, he concluded that, in the absence of evidence of intentional or wilful action, the delay "fits into the category of negligence on the part of the prosecution." Although weighing this factor against the Commonwealth, the judge concluded that such negligent delays "are neutral and are weighted less heavily" than intentional delays.

We agree with the judge that the failure to prosecute the application for interlocutory appeal, and the subsequent delay of two years in bringing a motion to vacate the dismissal of that application, constituted negligence in the handling of this case. While we agree with the judge that this delay is to be weighed less heavily than one calculated to frustrate the defense of an accused, see *Barker, supra* at 531, we believe, nevertheless, that it should be weighed quite heavi-

---

if a defendant has not been brought to trial within certain progressively shorter time periods, eventually to be one year. See Mass. R. Crim. P. 36 (b) (1) (A)-(C), 378 Mass. 909 (effective July 1, 1979). The new rule provides that certain time periods shall be excluded, such as those encompassing pretrial motions and interlocutory appeals. Mass. R. Crim. P. 36 (b) (2), 378 Mass. 910 (1979). Once the defendant has established a prima facie delay, and the Commonwealth offers no justification, the defendant is entitled to dismissal of the indictment without a showing of prejudice. See Mass. R. Crim. P. 36 (b) (1) (D), 378 Mass. 910 (1979), and Reporter's Notes. Even within the specified time periods, a defendant may obtain a dismissal if he can demonstrate prejudice. Mass. R. Crim. P. 36 (c), 378 Mass. 912 (1979). The new rule, of course, encompasses all existing case law under former G. L. c. 277, § 72A, to the extent that a defendant is not automatically entitled to dismissal if he acquiesces, *Commonwealth* v. *Jones,* 6 Mass. App. Ct. 750, 751-753 (1978); is responsible for the delay, *Commonwealth* v. *Loftis,* 361 Mass. 545, 549-550 (1972); or benefits from the delay, *Commonwealth* v. *Alexander,* 371 Mass. 726, 729 (1977).

[3] The Commonwealth's brief before this court concedes that the delay was due to negligence. This does not relieve the Commonwealth of responsibility for not having presented an explanation of the underlying facts causing the delay at the hearing on the motion to dismiss.

.

ly against the Commonwealth.[4] *Commonwealth* v. *Blaney,*
5 Mass. App. Ct. 96, 99 (1977).

c. *Assertion of the right.* The United States Supreme
Court expressly rejected a demand-waiver rule in the con-
text of the speedy trial right. *Barker, supra* at 528. The
defendant does have a responsibility to assert his right, how-
ever, and timely assertion is to be given "strong evidentiary
weight." *Id.* at 529, 531. Look did nothing whatsoever to
assert his right to a prompt trial until April 5, 1978, ten days
after the Commonwealth requested a trial date and nearly
four years after his indictment. It appears reasonable to
speculate (and the defendant has suggested in his brief
before this court) that Look was "gambling" that the Com-
monwealth had forgotten about him or decided not to pur-
sue his case.

The Commonwealth's application for interlocutory ap-
peal was dismissed on November 22, 1975, and the Com-
monwealth filed a motion to vacate that dismissal nearly
two years later on November 2, 1977. During that time, if
Look believed that the Commonwealth considered its case
too weak to pursue because of the allowance of Look's mo-
tion to suppress the victim's statements (a judgment which
might have been quite inaccurate, based on the evidence
eventually presented at the trial), he could have filed a mo-
tion for trial or a motion to dismiss at any time. He would
then have been relieved of any anxiety over whether he
would eventually be tried. When the Commonwealth did
file its motion to vacate on November 2, 1977, thus signaling
Look that it intended to pursue his case, Look still allowed
five months to pass before filing his first claim regarding a
speedy trial. This inaction on his part must be weighed

---

[4] In a case dealing with the statutory right of a prisoner to trial on addi-
tional charges within six months after demand under G. L. c. 277, § 72A,
we stated that "[w]here 'the delay or lack of any activity occurred in cir-
cumstances neither caused by nor attributable to the defendant,' . . . the
Commonwealth must at the very least, explain why such delay is 'reason-
ably necessary and justifiable.'" *Commonwealth* v. *Alexander,* 371
Mass. 726, 730 (1977).

heavily against him. *Dabrieo, supra* at 737. The speedy trial right is not one which may be kept in reserve in the event that one's belief that the prosecution has overlooked or decided not to pursue his case proves to be erroneous.

d. *Prejudice.* Look claims prejudice resulting from the delay in three respects: unavailability of a potential defense witness, failure of memory of all witnesses, and "anxiety and concern" on Look's part.

The unavailable witness, one Betty Roy, was alleged to have stayed at the Looks' campground in 1972, to have visited with them briefly in November of 1973, to have become friendly with the victim and to have spoken with the victim frequently thereafter. The testimony that Roy allegedly would have provided is that the marital relationship between Look and the victim was happy and harmonious. The trial judge found that "[h]er testimony may well have been excluded completely because of the remoteness in time (eight months and two months before January 28, 1974) and the brief duration of her observations during the 15 months preceding the death of Ms. Look. As Ms. Roy did not observe any of the factors or circumstances directly surrounding the alleged shooting, her testimony would be relevant, if admissible, only to the general issue of motive." The judge apparently relied on *Campbell, supra,* and *Dabrieo, supra,* for the principle that to demonstrate prejudice a defendant must show "that the unavailable witness would have produced direct evidence of innocence."

*Campbell* and *Dabrieo* must be limited to their facts,[5] however, and there is not necessarily a requirement that a

---

[5] In *Campbell,* the defendants presented no evidence that they searched for the missing witness, and no evidence as to what that witness's testimony might have been. *Commonwealth* v. *Campbell,* 5 Mass. App. Ct. 571, 584 (1977). In *Dabrieo,* the defendant claimed that "several alibi witnesses" who would have testified that he was at a party on the night of the crime were dead or unavailable. He presented evidence of a search "not undertaken with any great effort," and both the motion judge and this court apparently disbelieved his claim. See *Commonwealth* v. *Dabrieo,* 370 Mass. 728, 738 (1976).

defendant show that a missing witness might have produced direct (in the sense of eyewitness) evidence of innocence. The speedy trial right is primarily designed to ensure that an accused shall enjoy a full and fair trial, including the right to present witnesses of his choice for any potential effect they might have on the deliberative process of the jury, assuming that the intended testimony is admissible. Testimony about the marital relationship in the present case would have been extremely relevant (assuming that there had been a proper foundation laid), especially in light of the testimony of one Paul Dockham, which was admitted over Look's objection. Dockham testified that, three or four weeks prior to her death, the victim had told him she was unhappy and wanted to divorce Look.

The trial judge correctly found, however, that contrary testimony on this subject would be available. In fact, several other witnesses testified that Look and the victim were, in their estimation, happily married. One of these witnesses, Robert Ferreira, had lived with Look and his wife for some time. Look has not demonstrated in any but the most speculative way that Roy would have offered testimony adding anything significant to that of these witnesses.[6] Therefore, we believe the trial judge ruled correctly that Look did not show prejudice with regard to the missing witness. Cf. *Commonwealth* v. *Boyd, supra* at 180-181 (death of one of

---

[6] Look also argues that the Commonwealth should bear the burden of proving that Roy did not have potentially exculpatory evidence, relying on *United States* v. *Barket,* 530 F.2d 189 (8th Cir. 1976). In *Barket,* a forty-seven month pre-indictment delay was accompanied by the death of six material witnesses and faded memories of other witnesses. *Id.* at 192. Because the delay occurred before indictment when the speedy trial right had not attached, the court applied a Fifth Amendment due process analysis to uphold a District Court finding of "severe" prejudice. The Court of Appeals stated that "the Government must bear the burden of demonstrating that the missing witnesses did not possess exculpatory evidence." *Id.* at 196. The present case is quite different from *Barket,* where the defendant, because of inaction for which the government was found responsible, had no reason to believe he would have to prepare a defense and faced beginning that task nearly four years after the incident.

the defendant's psychiatrists not prejudicial to insanity defense when two of his other psychiatrists testified).

Look's second allegation of prejudice, failure of memory of many if not all witnesses, is similarly without foundation. We have reviewed the transcript, and find no significant failure of memory on crucial issues. In so reviewing the transcript, we were mindful of the fact that "[l]oss of memory . . . is not always reflected in the record because what has been forgotten can rarely be shown." *Barker, supra* at 532.

Regarding the "anxiety and concern" part of the test for prejudice, see *id.,* Look presents a weak claim. As the trial judge found, Look was not incarcerated pending trial, and his failure to assert his right for over four years belies any present assertion that the delay caused him undue anxiety.

In conclusion, we do not believe that Look's constitutional right to a speedy trial was violated. The delay, while lengthy, and the absence of reasons therefor, were not sufficient to warrant dismissal without a showing of prejudice. Cf. *Moore* v. *Arizona,* 414 U.S. 25, 26 (1973). Look's failure to assert his right during most of the delay, and his failure to demonstrate prejudice, tip the scales against him.

2. Look next argues that the trial judge erred in admitting the testimony of Vivian Ivers regarding telephone conversations she claimed to have had with the victim on the night of the homicide, and with Look a few days after the incident. The ground of his objection is that he was unfairly deprived of discovery during the probable cause hearing in a District Court because the judge sustained the objection of the Commonwealth as Ivers was about to testify about the substance of at least one of these conversations. He relies for this claim on *Myers* v. *Commonwealth,* 363 Mass. 843 (1973).

The import of our analysis and holding in *Myers* is that a defendant who stands accused of a crime has the right to confront and cross-examine witnesses of the Commonwealth, and to present his own witnesses by way of affirmative defense. *Myers, supra* at 852, 856. This is because the

accused, before being bound over to the grand jury or tried in a District Court, is entitled under G. L. c. 276, § 38, to a preliminary determination that "the Commonwealth has sufficient competent legal evidence to justify . . . a full trial," *id.* at 849, a hearing which "distinguishes between groundless or unsupported charges and meritorious prosecutions," *id.* at 847. *Stefanik* v. *State Bd. of Parole,* 372 Mass. 726, 731 (1977). *Corey* v. *Commonwealth,* 364 Mass. 137, 138 (1973).

We noted in *Myers* that a common utilization of the probable cause hearing is discovery by the defense, and that the judge should not unduly limit the defendant's cross-examination of prosecution witnesses "in order to effectuate the ancillary discovery and impeachment functions of the hearing . . . ." *Id.* at 857. See also *Commonwealth* v. *Britt,* 362 Mass. 325, 330-331 (1972).

The Commonwealth has no duty to present its entire case at the hearing, however, but simply enough to allow a reliable determination of probable cause. We held in *Lataille* v. *District Court,* 366 Mass. 525 (1974), that a defendant is not entitled by right to a probable cause hearing when a grand jury has indicted him, thereby providing a probable cause finding. *Id.* at 529-531. In response to the defendant's assertion that he had been denied discovery and impeachment, we stated in *Lataille:* "We held [in *Myers, supra*] that complete cross-examination and the opportunity to present affirmative defenses were crucial and necessary *to effectuate a true probable cause standard.* We did not hold then, nor do we hold now, that the discovery and impeachment functions are ends in themselves to be asserted apart from their evidentiary role in ascertaining probable cause where a preliminary hearing is held" (emphasis supplied). *Id.* at 530.

In this case, Look's counsel, not the Commonwealth, called Ivers at the probable cause hearing. Presumably Look was able to interview his witness prior to the hearing,[7]

---

[7] The trial judge observed that "[t]his Court is certainly not aware of any obstruction put in [Look's] path to such interviewing of a potential

but even if he did not, Ivers testified at the hearing that she had had a conversation with the victim, but not to its substance. The Commonwealth notified Look's counsel approximately two months prior to trial that it intended to call Ivers. Look therefore had ample time to utilize discovery procedures if he so chose.

We do not construe Look's present claim to be that he was deprived of a valid probable cause determination by reason of the exclusion of direct testimony of his own witness. Although in his brief Look suggests that Ivers might have produced testimony favorable enough to prevent bind-over on a murder charge, he offers nothing to substantiate this claim. Full cross-examination at trial failed to produce any such evidence. Indeed, Ivers' testimony at trial was entirely inculpatory, and it is difficult to fathom how full exploration of her testimony could have helped Look at the probable cause stage. Look may have relied on the District Court judge's determination that the substance of the conversation was inadmissible, but the argument that the Commonwealth is somehow estopped from presenting at trial testimony it did not present at the probable cause hearing is groundless.

3. Look next argues that his statements at the Wareham police station should have been suppressed on three separate grounds.

a. Lieutenant Masuret, when testifying at the probable cause hearing as to warnings given prior to interrogation of Look by Lieutenant Carr and himself, omitted the right to remain silent. At a hearing on a pretrial motion to suppress, Lieutenant Masuret testified that he remembered a conversation with Look's counsel following the probable cause hearing, in which Look's counsel told Masuret he had forgotten to give Look the warning, but Masuret responded that regardless of what he testified, he was sure he had

witness. . . . [T]his Court is aware that the very experienced defense counsel had available to him the services of a private detective at around the time of the probable cause hearing."

given all the warnings.[8]  He and Carr both testified to that effect at trial.  Furthermore, they both testified that Look told them he had previously been advised of his rights by Pierce and another officer and was well aware of them.

As we have stated before, "[n]o useful purpose is served by testing on the witness stand the officer's ability to recite accurately from memory the Miranda warnings he read." *Commonwealth* v. *Lewis*, 374 Mass. 203, 205 (1978).  Even if Carr and Masuret did omit one warning, however, the original warnings given at the hospital were sufficient to carry over into the interrogation by Pierce, Carr and Masuret.  See *Commonwealth* v. *Alicea*, 376 Mass. 506, 513-514 (1978), and cases cited therein.  There is no evidence of a break in the chain of events, such as an exercise of the right to remain silent, which might have necessitated new warnings.  See *Michigan* v. *Mosley*, 423 U.S. 96, 102-105 (1975).  Look talked freely and continuously to Pierce, and then to Carr and Masuret.  Furthermore, he indicated to Carr and Masuret that he still understood his rights as earlier stated to him, and that he wished to waive them.  There was no error in the judge's finding that "at the time of all of the Look statements in question he was well aware of his Miranda rights and in giving such statements he had voluntarily and knowingly waived such rights."

b.  Look next argues that his highly upset emotional state precluded valid waiver of his Miranda rights and therefore rendered his statements involuntary.  The judge found that "though he was obviously and for very good reason upset and filled with remorse, this did not reach the level where his statements should be described as anything but voluntary.  He spoke freely and without any compulsion."  This finding was supported by the evidence.  The courts must indulge every reasonable presumption against waiver of the fundamental constitutional rights embodied in the Miranda warnings.  *Johnson* v. *Zerbst*, 304 U.S. 458, 464 (1938).

---

[8] Look's counsel took the stand at the hearing and denied that any such conversation occurred.

The Commonwealth must meet a "heavy burden" of proof that a suspect waived those rights. *Commonwealth* v. *Dustin,* 373 Mass. 612, 615-616 (1977). *Commonwealth* v. *Hosey,* 368 Mass. 571, 577 (1975). While Look was "upset" about the death of his wife, the Commonwealth has met its burden in this case of showing that Look's emotional condition did not rise to the level at which his waiver was invalid. See *Hosey, supra* at 577 ("extremely emotional . . . detached from reality").

c. Look contends that all of his statements made to Pierce should have been suppressed by virtue of the intercom interception of the conversation by desk officers, and that all statements made to Carr and Masuret were likewise suppressible because they were obtained as a result of the overheard statements. He relies for this contention on G. L. c. 272, § 99, and 18 U.S.C. §§ 2510 et seq. (1976), the State and Federal eavesdropping statutes.

General Laws c. 272, § 99, as appearing in St. 1968, c. 738, § 1, is a comprehensive statute prohibiting almost all forms of warrantless electronic interceptions of oral or wire communications and the disclosure or use of any communication obtained in violation of the statute. The statute defines "intercepting device" as any device "which is capable of transmitting, receiving, amplifying, or recording a wire or oral communication . . .," and defines "oral communication" as "speech, except such speech as is transmitted over the public air waves by radio or other similar device." *Id.* § 99B 2, 3.

The Federal statute defines "oral communication" as "any oral communication uttered by a person exhibiting an expectation that such communication is not subject to interception under circumstances justifying such expectation." 18 U.S.C. § 2510(2) (1976). Like the State statute, the Federal statute prohibits the disclosure or use of any information obtained through warrantless eavesdropping.[9]

---

[9] Although Congress intended to preempt the field of wiretapping and eavesdropping in enacting 18 U.S.C. §§ 2510 et seq. (1976), State legisla-

The judge, in ruling on the motion to suppress, did not rule on the legality of the interception, because the Commonwealth had agreed not to present any evidence of the overheard conversations at the trial (and in fact did not present any). He found that Pierce himself had not intercepted any conversation, and that he could testify as a participant in the conversation. He further found that Carr and Masuret had obtained information from Look as a result of regular police procedure, and that therefore any illegality in the interception had no causal connection with their interrogation of Look. Thus he concluded that any "taint" which might have arisen from the interception was "purged" or "attenuated" by the independent interrogation of Look by Carr and Masuret.

Although the judge did not rule on the legality of the desk officers' interception of the Look-Pierce conversation, the parties are not in dispute as to what occurred. Therefore, it is open to this court to pass on the question. Rather than examining the issue in terms of "taint," which assumes illegality of the interception, we prefer to examine the legality of the interception itself.

First, we agree with the judge that Pierce could testify as a participant in the conversation with Look. Pierce had already advised Look of his Miranda·rights, including the fact that anything he said could be used against him. Therefore, Look had no reason to believe Pierce would not reveal his statements, and we need not even resort to cases which hold that misplaced confidence by a speaker that a listener will not reveal his words does not protect those statements. See *United States* v. *White*, 401 U.S. 745, 751 (1971); *Hoffa*

tion is permitted as long as it is not less restrictive than the Federal statute. See *Commonwealth* v. *Vitello*, 367 Mass. 224, 246-247 (1975). The Federal statute contains no "intercom exception," but its definition of "oral communication" as pertaining only to situations where the speaker justifiably expects privacy would arguably exclude circumstances where an "intercom" system has been installed. See generally *Vitello*, *supra* at 231 (both statutes "designed to ensure that unjustified and overly broad intrusions on rights of privacy are avoided;" that is, to protect Fourth Amendment rights).

v. *United States*, 385 U.S. 293, 302 (1966). A participant to a conversation may testify about it, and the fact that unknown to him others were listening when the conversation occurred does not alter this.

Second, the intercom interception by the desk officers was not illegal under either the State or the Federal statute. The former contains an exception for "intercom" systems, installed and used in the ordinary course of business.[10] The judge found that "[t]he reason the Wareham police officers listened to the intercom was because of their concern as to whether the defendant might act in [a] violent manner while he was with Pierce. This was because of the problem that [the police] had had with the defendant previously in the emergency room at the hospital and, further, because he was alone with Pierce in the room with the door closed. (Pierce is an elderly man)." The testimony at the hearing on the motion to suppress reveals no indication that anyone asked the officers why they listened to the conversation, nor did any of them testify about the purpose. The facts found by the judge may fairly be inferred, however, from a letter signed by the three intercepting officers, which was before the judge in support of the motion to suppress.

The judge's findings support the conclusion that the intercom, which obviously was installed for ordinary business purposes, was being used for one of those purposes on the night in question. That the officers failed to inform Pierce they would be listening may have been because it did not occur to them that Pierce might be in danger until after Look and Pierce entered the room.

As discussed above, the Federal statute requires that a speaker have a justifiable expectation of privacy with regard to "oral communications." 18 U.S.C. § 2510(2) (1976). In determining what is a justified expectation of privacy for purposes of § 2510, we must look to traditional Fourth

---

[10] "It shall not be a violation of this section . . . (b) for persons to possess an office intercommunication system which is used in the ordinary course of their business or to use such office intercommunication system in the ordinary course of their business." G. L. c. 272, § 99D 1 b.

Amendment law. See *United States* v. *Duncan,* 598 F.2d 839, 847 (4th Cir.), cert. denied, 444 U.S. 871 (1979); *United States* v. *Pui Kan Lam,* 483 F.2d 1202, 1205-1206 (2d Cir. 1973), cert. denied, 415 U.S. 984 (1974); *People* v. *Santos,* 26 Cal. App. 3d 397, 402 (1972). As stated above, a person who is talking to a police officer after being told that anything he says may be used against him in court, cannot justifiably claim to have an expectation of privacy as to any statement he makes. *Duncan, supra* at 852. *Santos, supra.* Therefore we think Look's statements do not fall within the definition of "oral communications" of § 2510, and are not subject to the Federal statute.

Because neither the State nor the Federal statute prohibits the interception of the Look-Pierce conversation by the desk officers, we need not consider whether Carr and Masuret, while interrogating Look, put to use any of the information they had obtained from the desk officers.[11]

We conclude that neither the State nor the Federal statute was violated by the action of the desk officers in listening to the conversation, and there was no error in the admission of any of Look's statements.

4. Look's next contention is that there was error in the admission of the shotgun because of a question whether the gun was in the same condition as it was on the night of the homicide. He further claims that "there once existed physical evidence [demonstrating] whether the weapon was in need of cleaning at the time of the incident."

We find no merit in either of these contentions. First, the question of the condition of the gun at the trial as compared to the night of the incident is a proper subject for cross-examination, and goes to the weight of the evidence rather than its admissibility. Cf. *Commonwealth* v. *Hogg,* 365 Mass. 290, 294-295 (1974); *Commonwealth* v. *White,* 353 Mass. 409, 419-420 (1967), cert. denied, 391 U.S. 968

---

[11] Masuret testified at the hearing on the motion to suppress that he intended to question Look about the argument with his wife when he entered the interrogation room. Carr testified that they did ask Look about the argument.

(1968). There was testimony that the gun had been marked with a number shortly after the incident, and that it was similarly marked when allowed in evidence. There was considerable testimony about an oil can being found on the table where Look claimed to have been cleaning his gun, and a photograph of the dining room table, with the oil can and the gun on it, was admitted in evidence. There was also testimony that rags were found near the dining room table. The jury had ample evidence to consider in determining whether to believe that Look killed his wife accidentally or intentionally and we find nothing to substantiate Look's claim that exculpatory evidence was lost. See generally *Commonwealth* v. *Boyer*, 355 Mass. 762, 764 (1969).

5. Pursuant to G. L. c. 278, § 33E, as it existed on the date of the defendant's conviction, we have considered the whole case as to both the law and the facts, and we find no reason to change the verdict or to grant the defendant any other relief.[12] For a later amendment to G. L. c. 278, § 33E, see St. 1979, c. 346, § 2, which took effect on July 1, 1979.

*Judgment affirmed.*

---

[12] Both Look and the Commonwealth waived an instruction on manslaughter.